UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 08-883(DSD/JJG)

_____

In re MoneyGram International, Inc.          **ORDER**
Securities Litigation

_____

    This matter is before the court upon defendants' motion to
dismiss the consolidated securities class action complaint.  Based
upon a review of the file, record and proceedings herein, and for
the reasons stated, the court grants in part and denies in part
defendants' motion.

## BACKGROUND

    In this consolidated securities class action, lead plaintiff
Oklahoma Teachers' Retirement System ("lead plaintiff") asserts
claims pursuant to sections 10(b) and 20(a) of the Securities
Exchange Act of 1934 ("Exchange Act") and the Securities and
Exchange Commission ("SEC") Rule 10b-5 against defendants MoneyGram
International, Inc. ("MoneyGram") and the following individuals:
Philip Milne ("Milne"), MoneyGram's former chief executive officer
and chairman of the board of directors; David Parrin ("Parrin"),
MoneyGram's chief financial officer; Jean Benson ("Benson"),
MoneyGram's controller; William Putney ("Putney"), MoneyGram's
former chief investment officer (collectively "officer
defendants"); and former members of MoneyGram's finance and

investment committee, Douglas Rock ("Rock"), Monte Ford ("Ford"), Donald Kiernan ("Kiernan"), Ruiz Montemayor and Albert Teplin (collectively "investment committee defendants"). The 358-page amended consolidated class action complaint ("complaint") asserts claims on behalf of all persons and entities who purchased or otherwise acquired MoneyGram securities between January 24, 2007, and January 14, 2008 ("class period").

## I.    General Background

During the class period, MoneyGram was a public company traded on the New York Stock Exchange that provided global payment services and products through a network of agents and financial institution customers. (Compl. ¶¶ 20, 21.) MoneyGram consisted of a Global Funds Transfer segment and a Payment Systems segment. The Global Funds Transfer segment provided money transfer services, money orders and bill payment services to consumers. The Payment Systems segment provided payment processing services - including official check outsourcing services[1] - to financial institutions. (Id. ¶ 21; Puls Aff. Ex. B at 2, 4.[2])

---

[1] Official checks included bank checks, cashier checks, teller checks and agent checks. (Id. ¶ 25.)

[2] The court considers MoneyGram's SEC filings submitted by defendants without converting this motion to one for summary judgment. See Noble Sys. Corp. v. Alorica Cent. LLC, 543 F.3d 978, 982 (8th Cir. 2008) (court may consider on a motion to dismiss "public records, materials that do not contradict the complaint, or materials that are necessarily embraced by the pleadings" (citations omitted)).

To use the Global Funds Transfer segment's money order service, customers provided funds to a MoneyGram agent who then issued a money order and remitted the funds to MoneyGram. MoneyGram retained the funds for seven to nine days until the money order was presented for payment. (Compl. ¶¶ 23, 38-39.) Similarly, the Payment Systems segment's official check outsourcing service allowed financial institutions to issue MoneyGram's official checks to their customers for use in transactions where the payee required a check drawn on a bank or other third party. (Id. ¶ 25.) The financial institutions also used MoneyGram's official checks to pay their own obligations. (Id.) After issuance of an official check, the financial institution remitted the funds to MoneyGram. MoneyGram retained the funds for three to five days as the official check was processed. After the check cleared, MoneyGram settled with the processing bank. (Id. ¶¶ 35, 36.)

MoneyGram invested the temporarily remitted money order and official check funds ("investment funds") in an investment portfolio ("Portfolio") that was monitored and valued by the individual defendants and ten members of MoneyGram's investment department.[3] Various state regulatory and private contractual obligations required MoneyGram to maintain cash, cash equivalents,

---

[3] Approximately eighty percent of the investment funds came from the official checks, with the remainder from the money orders. (Id. ¶¶ 35, 38.)

receivables and securities with an investment rating of A or higher on a one-to-one ratio with the amount of outstanding MoneyGram money orders and official checks ("payment service obligations"). (Id. ¶¶ 29-32.)

MoneyGram paid its largest financial institution customers a commission based on the average balance of funds generated by the institutions' sale of official check products. (Id. ¶¶ 26, 37.) The commission was generally calculated according to "a variable rate based on short-term financial indices, such as the federal funds rate." (Id. ¶ 37.) To mitigate the risk of interest rate fluctuations on the commission rate, MoneyGram "entered into variable-to-fixed interest rate swaps, whereby MoneyGram paid an average fixed rate of 4.3% and the counterparty paid MoneyGram a variable interest rate on the notional amount of the swap agreement."[4] (Id.; Puls Aff. Ex. B at 30.) As a result, MoneyGram's net investment revenue from the Portfolio, as relevant here, was "the difference, or 'spread,' between the amount [MoneyGram] earn[ed] on [the Portfolio] and the commissions [it paid] ... net of the effect of the swap agreements." (Puls Aff. Ex. B at 14.) Gains from the Portfolio were posted as revenue in

---

[4] An interest rate swap is "an arrangement whereby two parties (called counterparties) enter into an agreement to exchange periodic interest payments. The dollar amount the counterparties pay each other is an agreed-upon periodic interest rate multiplied by some predetermined dollar principal, called the notational principal amount." John Downes & Jordan Elliot Goodman, Dictionary of Finance and Investment Terms 700 (7th ed. 2006).

4

MoneyGram's Global Funds Transfer segment and Payment Systems segment. (Compl. ¶ 28.)

MoneyGram's daily net cash settlements followed a pattern in which some days MoneyGram experienced net cash inflows and other days net cash outflows. MoneyGram used repurchase agreements to fund any shortfalls and generally paid the agreements back the following net cash inflow day. The repurchase agreements were "uncommitted [credit] facilities with various banks [that] require[d] specific securities to be designated as collateral for borrowings under the agreements." (Id. ¶ 242(3); Puls Aff. Ex. O at 32.) Whether to accept securities as collateral was at the discretion of MoneyGram's counterparties.

MoneyGram relied on credit ratings from Moody's Corporation ("Moody's"), Standard & Poor's ("S&P") and Fitch Ratings ("Fitch"). (Id. ¶ 54.) If these agencies split ratings by rating a security differently, MoneyGram disclosed the highest rating from either Moody's or S&P to the SEC and state regulators but relied on the lowest rating for internal valuations. (Id. ¶¶ 54, 236.)

To determine the "fair value" of its investment securities ("fair value determination method"), MoneyGram generally relied on third party pricing services that priced the securities based upon quoted market prices, broker pricing, matrix pricing, indices and pricing models. If no third party pricing service would provide pricing, MoneyGram obtained pricing from brokers. If no brokers

would price a security, or if MoneyGram disagreed with a third party's pricing, MoneyGram internally priced the security using available market information, pricing models and its own stated assumptions about how a similar market participant would price a security. (Id. ¶¶ 56, 238.)

MoneyGram assessed whether a security was other-than-temporarily impaired ("OTTI") on a monthly basis, considering potential impairment indicators such as credit rating downgrades, accelerating default rates on the underlying collateral, changes in cash flow performance and MoneyGram's intent and ability to hold the security long enough to recover its amortized cost ("impairment review process"). If MoneyGram determined that a security was OTTI, the loss became "a realized loss through an impairment charge in the income statement." (Puls Aff. Ex. B at 15.) Temporary impairments were recognized as equity on MoneyGram's balance sheet and labeled as unrealized losses.

By January 24, 2007, the investment securities in the Portfolio were reportedly valued at $5.85 billion. (Compl. ¶ 47.) The majority of these securities allegedly were asset-backed securities ("ABS"), mortgage-backed securities ("MBS") and collateralized debt obligations ("CDO") that were collateralized in

part by residential mortgage-backed securities ("RMBS") and commercial mortgage-backed securities ("CMBS").[5] (Id. ¶¶ 44, 47.)

---

[5] These instruments are concisely explained as follows:

The issuer of mortgage-backed and other forms of asset-backed securities in structured finance transactions is typically a special-purpose vehicle, or "SPV." ... These securities are customarily categorized as [MBS], [ABS], [CDO], or ABS CDO. MBS are securities whose payment derives principally or entirely from mortgage loans owned by the SPV. ABS are securities whose payment derives principally or entirely from receivables or other financial assets - other than mortgage loans - owned by the SPV. Industry participants refer to transactions in which SPVs issue MBS or ABS as "securitization."

The term "securitization" also technically includes CDO and ABS CDO transactions. CDO securities are backed by - and thus their payment derives principally or entirely from - a mixed pool of mortgage loans and/or other receivables owned by an SPV. ABS CDO securities, in contrast, are backed by a mixed pool of ABS and/or MBS securities owned by the SPV, and thus their payment derives principally or entirely from the underlying mortgage loans and/or other receivables ultimately backing those ABS and MBS securities....

The classes, or "tranches," of MBS, ABS, CDO, and ABS CDO securities ... are typically ranked by seniority of payment priority. The highest priority class is called senior securities. In MBS and ABS transactions, lower priority classes are called subordinated, or junior, securities. In CDO and ABS CDO transactions, lower priority classes are usually called mezzanine securities ....

The senior and many of the subordinated classes of these securities are more highly rated than the quality of the underlying receivables.... This is accomplished by allocating cash collections from the receivables first to pay the senior classes and thereafter to pay more junior classes .... In this way, the senior classes are highly overcollateralized to take into account the possibility ... of delays and losses on collection.

(continued...)

Over $1.65 billion of these securities were backed by subprime or Alt-A mortgages.[6]  (<u>Id.</u> ¶ 52.)

Shortly before and during the class period, the housing and mortgage industry that ballooned between 1996 and 2005 deteriorated.  (<u>Id.</u> ¶¶ 49-50.)  Sales of existing homes dropped, housing prices fell, the subprime mortgage industry collapsed and mortgage defaults and foreclosures surged.  (<u>Id.</u> <u>passim</u>)  As a result, the value of MBS and CDO supported by subprime and Alt-A mortgages plummeted and the market for these securities froze. (<u>Id.</u> ¶ 91.)  This lawsuit arises out of defendants' public statements during the class period regarding the effect of this market collapse on the Portfolio.

## II.  **Class Period**

On January 24, 2007, MoneyGram issued a press release detailing its 2006 revenue, noting that 2006 was the strongest year

---

[5](...continued)
Steven L. Schwarcz, <u>Protecting Financial Markets: Lessons from the Subprime Mortgage Meltdown</u>, 93 Minn. L. Rev. 373, 376-78 (2008) (citing Downes & Goodman, <u>supra</u>).

[6] The prime rate is the "base rate that banks use in pricing commercial loans to their best and most creditworthy customers." Downes & Goodman, <u>supra</u>, 538.  "Prime borrowers as a group generally receive the same terms from most lenders, while subprime borrowers are sorted into a number of different risk classes.... Borrowers who have prime credit scores but cannot provide full income documentation, or otherwise pose a higher risk, are considered 'Alt-A' borrowers."  Todd J. Zywicki & Joseph D. Adamson, <u>The Law and Economics of Subprime Lending</u>, 80 U. Colo. L. Rev. 1, 7 (2009) (citations omitted).

in MoneyGram's history and predicting that average Portfolio balances in 2007 would be between $6.0 and $6.3 billion. (Id. ¶ 110.)  At an earnings conference call that day, Milne noted that "*[w]e continued to be very disciplined ... and while the yield curve remains challenging, we are managing the [P]ortfolio effectively.*"[7]  (Id. ¶ 111.)  Milne also indicated that "*we are focused on building shareholder value over the long-term and our investments today are an important part of this process as we capitalize on the many opportunities we see in the global marketplace.*"  (Id.)  In response to a question about the challenging environment for the Portfolio, Milne stated:

> [I]t's been 3 years now that we've been in this type of environment and our [P]ortfolio managers have done just an outstanding job continuing to get some spread for us.  I think the other thing in looking to '07 [is that] what we're seeing for a yield curve is pretty much the consensus.  It'll continue to be flat.  So that's the most I can predict at this moment.

(Id.)  Parrin added that "*we're going to keep playing defense,*" and focus on not introducing risk into the Portfolio while "*grow[ing] the heck out of the money transfer and bill payment businesses.*" (Id.)

On March 1, 2007, MoneyGram filed with the SEC its 2006 Form 10-K ("2006 10-K"), which provided a comprehensive overview of the company for fiscal year ended December 31, 2006.  (Id. ¶ 118; Puls

---

[7] All alterations are in the complaint.

Aff. Ex. B.)  MoneyGram reported $1.2 billion in total revenue, $124.1 million in net income, $358.9 million in unrestricted assets,[8] a fair value of the Portfolio's available-for-sale ("AFS") investments of $5.7 billion and $5.2 million in OTTI securities. (Puls Aff. Ex. B at 20, 27, 33, F-20.)  Of the Portfolio's reported $43.1 million in total unrealized losses, $23.2 million came from RMBS, $2.1 million from CMBS and $7.8 million from other ABS.  (Id. at F-21; Compl. ¶ 118(a).)  One ABS and one investment security with unrealized losses greater than twenty percent of amortized cost accounted for $0.1 million of the Portfolio's unrealized loss. The remaining $43.0 million in unrealized losses related "to securities with an unrealized loss position of less than 20 percent of amortized cost, the degree of which suggests that the[] securities do not pose a high risk of being [OTTI]."  (Puls Aff. Ex. B at F-22.)  Moreover, unrealized losses of $22.6 million in RMBS, $1.3 million in CMBS and $5.8 million in ABS came from securities with aged unrealized losses of twelve months or more. (Id. at F-21.)  Securities with "Moody's equivalent rating[s] of Aaa, Aa, A or Baa or a [S&P] equivalent rating of AAA, AA, A or BBB," ("investment grade securities"), accounted for $26.3 million of the unrealized losses, with the remainder of losses comprised of $6.6 million from U.S. government agency fixed income securities,

---

[8]   MoneyGram's unrestricted assets were "cash and cash equivalents, receivables, and investments [that] exceed[ed] all payment service obligations."  (Puls Aff. Ex. B at 33.)

10

$7.8 million from ABS and $2.3 million from preferred securities. (Id.) MoneyGram recognized these as unrealized losses because they were "*caused by liquidity discounts and risk premiums required by market participants in response to temporary market conditions, rather than a fundamental weakness in the credit quality of the issuer or underlying assets or changes in the expected cash flows from the investments.*" (Compl. ¶ 118(b).[9]) MoneyGram also affirmed that it had "*both the intent and ability to hold these investments to maturity.*" (Id.)

The 2006 10-K indicated that MoneyGram generally determined the fair value of a security "based on quoted market prices." (Puls Aff. Ex. B at F-13.) MoneyGram further revealed that it valued investments that were not readily marketable "based on cash flow projections that require a significant degree of management judgment as to default and recovery rates of the underlying investments." (Id. at F-14.) MoneyGram accordingly cautioned that "these estimates may not be indicative of the amounts we could realize in a current market exchange. The use of different market assumptions or valuation methodologies may have a material effect on the estimated fair value amounts of these investments." (Id.)

---

[9] The complaint does not emphasize this language in paragraph 118(b), but emphasizes identical language in later paragraphs. (See id. ¶ 142(d).)

MoneyGram also disclosed that its management determined whether a security is OTTI based on a "*case-by-case evaluation of the underlying reasons for the decline in fair value*" that included

> *a monthly review of all securities using a screening process to identify those securities for which fair value falls below established thresholds for certain time periods, or which are identified through other monitoring criteria such as ratings downgrades. A monthly meeting is held to discuss those securities identified by the screening process. Based on this meeting, management makes an assessment as to whether any of the securities are [OTTI]. In making this assessment, management considers both quantitative and qualitative information, as well as the Company's intent and ability to hold an investment to recovery. If the Company does not have the intent or the ability to hold the investment until recovery, an investment with a fair value less than its carrying value will be deemed [OTTI].*

(Compl. ¶ 118(b).) The document then identified the assessment factors considered by management and stated that when "*an adverse change in expected cash flows occurs, and if the fair value of a security is less tha[n] its carrying value, the investment is written down to fair value.*" (Id.) MoneyGram warned that its methodology required "professional judgment" that presented "inherent risks and uncertainties," including "[c]hanges in circumstances and critical assumptions such as a continued weak economy, a more pronounced economic downturn or unforeseen events." (Id.) MoneyGram further noted that "for securitized financial assets with contractual cash flows (e.g. [ABS]), projections of

12

expected future cash flows may change based upon new information regarding the performance of the underlying collateral," and that "*[a]dverse changes in estimated cash flows in the future could result in impairment losses to the extent that the recorded value of such investments exceeds fair value for a period deemed to be other-than-temporary.*" (Id.)

The 2006 10-K also provided that "any ratings downgrade could increase our cost of borrowing or require certain actions to be performed to rectify such a situation. A downgrade could also have an effect on our ability to attract new customers and retain existing customers." (Id. ¶ 119(2).) Moreover, the 2006 10-K indicated that a "wholly owned subsidiary" of MoneyGram was acting as "collateral advisor for a pool of investment securities owned by a third party. Deterioration in the value or performance of this investment pool, while not directly related to [MoneyGram's] own performance, could adversely affect the business and prospects of the collateral advisor." (Id. ¶ 398; Puls Aff. Ex. B at 15.)

As required by the Sarbanes-Oxley Act of 2002 ("SOX") Milne and Parrin certified in the 2006 10-K that they:

> *Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under [their] supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared.*

13

(Compl. ¶ 118(c).)

At a conference call and presentation on March 7, 2007, an unidentified MoneyGram representative stated that "*you've seen a lot of headline risk out there ... in equities [and] bonds, but I don't think there's really been any changes since we've had our last earnings call that would really impact the [P]ortfolio at this point one way or another outside of that range.*" (Id. ¶ 123.)

On April 18, 2007, MoneyGram issued a press release detailing its financials and projections for the first quarter ended March 31, 2007 ("1Q07"). (Id. ¶ 136.)   At an earnings conference call on the same day, Milne stated that "[w]e continue to be disciplined in managing [the Portfolio], which we expect to average roughly $6.0 to $6.3 billion in 2007." (Id. ¶ 137.)

The 1Q07 Form 10-Q[10] ("1Q07 10-Q") filed by MoneyGram on May 10, 2007, reported total revenue of $310.1 million, net income of $29.8 million, unrestricted assets of $341.8 million, a fair value of the Portfolio's AFS investments of $5.5 billion and $978,000 in OTTI securities.   (Puls Aff. Ex. C at 9-10, 19.)   Of the Portfolio's reported $58.0 million in total unrealized losses, RMBS accounted for $18.6 million, CMBS for $1.0 million and other ABS for $31.1 million.   (Id. at 9; Compl. ¶ 142(a).)   The 1Q07 10-Q disclosed that $3.1 million of the unrealized losses came from one

_____

[10] A Form 10-Q is a quarterly report that provides a continuing view of a company's financial position.   (Puls. Aff. Ex. C.)

MBS and one ABS with unrealized losses greater than twenty percent of amortized cost.  The remainder of unrealized losses consisted of $43.0 million in investment grade securities, $9.4 million in U.S. government agency fixed income securities, $2.4 million in ABS and $0.1 million in RMBS.  In addition, unrealized losses of $17.8 million in RMBS, $622,000 in CMBS and $6.4 million in ABS came from securities with aged unrealized losses of twelve months or more. (Puls Aff. Ex. C at 10.)  MoneyGram reiterated that it had the "*intent and ability to hold the[] investments [accounting for the unrealized losses] to maturity.*"  (Compl. ¶ 142(d).)  The Form included the required SOX certifications from Milne and Parrin. (Id. ¶ 142(e).)

MoneyGram announced its financial results for the quarter ended June 30, 2007, ("2Q07") in a July 18, 2007, press release, in which Milne stated "we continue to be pleased with year over year performance of [the Portfolio] that allows us to continue to invest in our money transfer platform."  (Id. ¶ 161.)  In a same-day earnings conference call, an analyst questioned the effect of the turmoil in the subprime mortgage market on the Portfolio's value. In response, Parrin acknowledged that some of the Portfolio's securities were backed by subprime mortgages, but noted that they were "typically A rated or better," and that he had "seen very little impact from what has been going on in the marketplace from the rating agencies or otherwise on those levels of the

securities." (<u>Id.</u> ¶ 162.)   Responding to a follow-up question about potential permanent impairment of the Portfolio's securities backed by subprime mortgages, Parrin stated:

> *I think our current view at this point in time is that it would be temporary.   And there's been a lot of noise going on in the marketplace as it has had an impact on that. And we just got to get that to settle down. Again, when we look at these assets and where we are buying at the high end, we feel pretty comfortable with where we sit on the collateral and the types of losses that have been experienced by both types of collateral we own.*

(<u>Id.</u>)

On August 9, 2007, MoneyGram filed its 2Q07 Form 10-Q ("2Q07 10-Q").   (<u>Id.</u> ¶ 173; Puls Aff. Ex. D.)   That document identified $333.3 million in total revenue, $32.4 million in net income, $297.1 million in unrestricted assets, a $5.6 billion fair value of the Portfolio's AFS investments and $517,000 in additional OTTI. (Puls Aff. Ex. D at 9-10, 20.)   Of the Portfolio's $116.7 million in total unrealized losses, $32.4 million came from RMBS, $5.8 million from CMBS and $68.0 million from other ABS.   (<u>Id.</u> at 9; Compl. ¶ 173(a).)   Four ABS with unrealized losses greater than twenty percent of amortized cost accounted for $5.1 million of the unrealized losses.   The remainder of unrealized losses consisted of $90.5 million in investment grade securities, $17.5 million in U.S. government agency and fixed income securities and $3.6 million in other ABS.   (Compl. ¶ 173(d).)   Moreover, unrealized losses of

$27.1 million in RMBS, $534,000 in CMBS and $10.7 million in ABS came from securities with aged unrealized losses of twelve months or more.  (Puls Aff. Ex. D at 11.)  MoneyGram explained that:

> *Temporary market conditions at June 30, 2007 and December 31, 2006 are primarily due to changes in interest rates and credit spreads due to market conditions caused by subprime mortgages and excess leverage in the credit market.  [MoneyGram] regularly monitors [the Portfolio] to ensure that investments that may be [OTTI] are identified in a timely manner and that any impairments are charged against earnings in the proper period.... Given the facts and circumstances, [MoneyGram] has determined the securities [causing the unrealized loss] were temporarily impaired when evaluated [considering factors such as the financial condition and near-term and long-term prospects of the issuer] at June 30, 2007.  [MoneyGram] has both the intent and ability to hold these investments to maturity.*

(Compl. ¶ 173(d).)

The 2Q07 10-Q also addressed the Portfolio's exposure to the subprime mortgage market.  MoneyGram indicated that $384.0 million of the Portfolio's fair value consisted of "securities that are collateralized by subprime mortgages which are classified in 'Other [ABS].'" (Id. ¶ 173(e).)  Ninety-seven percent of those securities reportedly had a credit rating of A or higher.  (Id.)  MoneyGram also noted that eighty-eight percent of the securities were collateralized by mortgages originating before 2006, "*which is significant as the loss experience in pre-2006 collateral appears to be much lower than more recent vintages of subprime mortgages.*" (Id.)  In addition, MoneyGram disclosed that of the $68.0 million

17

in unrealized losses attributable to the Portfolio's ABS, $6.6 million came from these securities with "*direct exposure to subprime mortgages as collateral.*" (Id.)  Finally, MoneyGram represented that the "Other [ABS]" category included $620.1 million in CDO that were "backed by diversified collateral pools that may include subprime mortgages of various vintages," but that $576.7 million of these securities had credit ratings of A or better. (Id.)  Milne and Parrin again made the required SOX certifications. (Id. ¶ 173(h).)

Milne gave a presentation on September 11, 2007, indicating that the Portfolio "*continues to perform as we would expect.*"[11] (Compl. ¶ 192.)  In that presentation, Milne reiterated the Portfolio's $384-million exposure to subprime mortgages in the "other ABS" category and disclosed specifics about the Portfolio's RMBS and CDO.  According to Milne, none of the $1.5 billion in RMBS were securitized by subprime mortgages.  Milne, however, disclosed that $646.0 million of the RMBS had Alt-A mortgages as collateral, of which ninety-nine percent were rated A or better.  (Puls Aff. Ex. I.)  Milne also revealed that the "other ABS" category included $191.0 million in high grade CDO and $429.0 million in mezzanine

---

[11] MoneyGram disclosed the presentation in a Form 8-K, which provides a report of unscheduled or material events or corporate changes.  (Puls Aff. Ex. I.)

CDO with some exposure to the subprime market.[12]  (Puls Aff. Ex. I;
Compl. ¶ 193.)   Ninety-three percent of the high-grade CDO and
ninety-two percent of the mezzanine CDO were rated A or higher.
(Puls Aff. Ex. I.)

An October 17, 2007, press release regarding MoneyGram's
financial results for the quarter ended September 30, 2007,
("3Q07") announced that MoneyGram had "retained JP Morgan to
complete a strategic review of its Payment Systems business."[13]
(Compl. ¶ 213.)  MoneyGram also indicated that at the end of 3Q07
it drew down the balance of its $197.0 million senior credit
facility to fund the acquisition of PropertyBridge, Inc. - an
electronic payment processing services provider in the real estate
management industry - and to invest in cash equivalents to
supplement MoneyGram's unrestricted assets.   The press release
noted that MoneyGram's management considered unrestricted assets
"as providing additional assurance that regulatory and other
requirements [were] met during fluctuations in the value of
investments." (Id.)  The press release continued that:

> *Net unrealized [Portfolio] losses during the*
> *third quarter increased by approximately*
> *$230.0 million, a result of the illiquidity in*

---

[12]  MoneyGram defined "high grade CDO[] as those having
collateral with an A- or better average rating at purchase," and
mezzanine CDO as "those having collateral with a BBB/BBB- average
rating at purchase."  (Puls Aff. Ex. O at 12.)

[13] MoneyGram filed the press release in a Form 8-K.  (Puls Aff.
Ex. J.)

> *the market for subprime [ABS] and CDO[]. The*
> *increase in net unrealized losses reduced*
> *unrestricted assets; however, this was*
> *partially offset by the additional borrowing.*
> *Unrestricted assets were $285.7 million at the*
> *end of the third quarter.*

(<u>Id.</u>)

At a conference call that day, Parrin stated that the Portfolio's "*securities are purchased for the long term and outside of a small part used for repo's not an integral to our daily liquidity.*" (<u>Id.</u> ¶ 214.) Parrin also explained that MoneyGram drew down its credit facility "as a matter of prudence." (<u>Id.</u>) In addition, Parrin commented on MoneyGram's method of Portfolio valuation and OTTI assessment:

> *MoneyGram classifies its [Portfolio] as*
> *available for sale and we have a very*
> *disciplined approach to determine fair value*
> *in accordance with Generally Accepted*
> *Accounting Principles [("GAAP")].* It is not a
> new approach nor is it one that allows us to
> ignore the facts of the marketplace. *We*
> *cannot and do not price the securities at our*
> *discretion.*
>
> ....
>
> *[W]e have a disciplined approach to valuate*
> *whether a security in an unrealized loss*
> *position is temporarily impaired or*
> *permanently impaired. A temporary impairment*
> *is reflected on our balance sheet through*
> *equity while permanent impairment is reflected*
> *through our income statement. An important*
> *consideration of this valuation is*
> *[MoneyGram's] intent and ability to hold the*
> *securities. A review of our quarterly*

> *financial statement shows that we have*
> *recorded other than temporary impairments over*
> *time, based on this disciplined approach.*

(Id.)  In response to questions, Milne reported that most of the Portfolio's securities were "*still performing*," that JP Morgan's strategic review might result in altering the strategy for the Portfolio and that he had "*not seen any [securities downgrades] that have had a direct impact on the [Portfolio]*." (Id.)

On October 18, 2007, MoneyGram's stock price dropped 11.4 percent from $22.56 to $19.98 per share and Moody's downgraded MoneyGram's debt rating to the lowest possible investment grade. (Id. ¶ 218.)  The following day, Fitch downgraded MoneyGram's credit rating to one level above "junk" status.  (Id. ¶ 219.)

MoneyGram filed its 3Q07 Form 10-Q ("3Q07 10-Q") on November 7, 2007, reporting total revenue of $341.6 million, net income of $34.3 million, unrestricted assets of $285.7 million, a fair value of the Portfolio's AFS investments of $5.3 billion and $4.6 million in additional OTTI securities.[14]  (Puls Aff. Ex. O at 9, 11, 23.) MoneyGram disclosed that $5.1 billion of the Portfolio's fair value consisted of investment grade securities.  (Compl. ¶ 236.) Nevertheless, $3.7 billion of the Portfolio's securities

_____

[14] The other-than-temporary impairments experienced in 3Q07 came from "two investments backed primarily by home equity loans and one security backed by a diversified asset-backed pool, including home equity loans, manufactured housing loans and aircraft leases."  (Id. ¶ 237.)  The impairments resulted from credit rating downgrades and "the tight credit market for commercial paper."  (Id.)

experienced unrealized losses, with $1.7 billion experiencing aged unrealized losses for twelve months or more. (Puls Aff. Ex. O at 13.) Of the Portfolio's reported $337.3 million in unrealized losses, $24.7 million came from RMBS, $20.7 million from CMBS and $281.2 million from other ABS. (Id.) Forty-nine securities classified as "other ABS" and four classified as "CMBS" had unrealized losses greater than twenty percent of amortized cost and accounted for $145.3 million of the unrealized losses. (Compl. ¶ 239.) These securities constituted twenty-six mezzanine ABS CDO, seven high-grade ABS CDO, three subprime MBS and seventeen ABS with a broad range of collateral type. (Id.) Securities with an investment grade rating accounted for $321.6 million of the unrealized losses. (Id.) In addition, unrealized losses of $19.3 million in RMBS, $1.6 million in CMBS and $34.7 million in ABS came from securities with aged unrealized losses of twelve months or more. MoneyGram explained that:

> The unrealized losses were caused by a general lack of liquidity in the [ABS] market and deterioration in the broader credit markets (the "market disruption"). This market disruption was triggered by concerns surrounding subprime [MBS], but also extended to other [ABS] in the market. [MoneyGram] believes that the unrealized losses generally are caused by liquidity discounts and risk premiums required by market participants in response to current market conditions. Market conditions at September 30, 2007 primarily reflect wider credit spreads due to heightened concerns regarding the risk of securities backed by mortgage-based collateral, historically low levels of activity in the

> related market for these securities and a
> tighter credit market. These market
> conditions have not adversely impacted the
> cash flow performance of these securities at
> this time, nor have any adverse changes in
> expected future cash flow performance been
> identified at this time based on information
> available through the date of this filing.
> [MoneyGram] believes at this time that these
> market conditions are temporary and will
> improve on a gradual basis.

(Id.)

The 3Q07 10-Q also detailed the Portfolio's exposure to subprime mortgages. Specifically, MoneyGram disclosed that as of September 30, 2007, $336.2 million of the Portfolio consisted of securities collateralized by subprime mortgages and classified as "other ABS." MoneyGram reported that nearly all of these securities had investment grade ratings. In addition, eighty-nine percent of the subprime ABS were pre-2006 vintage, ten percent were 2006 and one percent was 2007. MoneyGram emphasized that "industry loss experience in pre-2006 vintages appears to be much lower than the 2006 and 2007 vintages." (Puls Aff. Ex. O at 11.) The 3Q07 Form-10Q also reported that the Portfolio contained $501.0 million in CDO with indirect exposure to subprime mortgages. (Id. at 12.) Thirty percent of these were high-grade CDO and the remainder were mezzanine. (Id.) Ninety-five percent of each class of CDO were reported as investment grade. (Id.)

MoneyGram further disclosed in the 3Q07 10-Q its method for rating the Portfolio's securities and provided additional detail

23

regarding its fair value determination method and impairment review process. MoneyGram first reported that it used the highest rating from either Moody's or S&P if the ratings agencies had split ratings, and that it believed the ratings changes for ABS had not materially affected the fair value of the securities as of September 30, 2007. (Compl. ¶ 236.) Second, MoneyGram fully revealed for the first time the details of its fair value determination method, noting that as of December 31, 2006, third-party pricing services priced sixty-three percent of the Portfolio, brokers priced thirty-five percent and MoneyGram internally priced two percent, but that by September 30, 2007, these percentages had changed to fifty-eight, twenty-seven and fifteen, respectively.[15] MoneyGram predicted that the increase in internal valuations would continue for the foreseeable future. (Id. ¶ 238.) Third, MoneyGram supplemented its prior explanations of the impairment review process as follows:

> [C]hanges in individual security values are regularly monitored to identify potential impairment indicators, such as credit rating downgrades, accelerating default rates on underlying collateral and changes in cash flow performance. The process includes a monthly global assessment of [the Portfolio] given current market conditions, as well as a monthly review of all securities using a screening process to identify those securities for which fair value falls below established thresholds for certain time periods, or which

---

[15] The complaint alleges that MoneyGram knew about the increase in internal pricing as early as July 1, 2007. (Id. ¶ 239.)

are identified through other monitoring
criteria such as credit ratings downgrades.
[MoneyGram] evaluates the facts related to the
individual securities identified as a result
of this process, including cash flow
performance, actual default rates compared to
default rates assumed in determining expected
cash flows, subordination available as credit
protection on [MoneyGram's] investment and the
impact of any credit rating downgrades on
expected future cash flows. [MoneyGram] also
considers its intent and ability to hold the
security for a time sufficient to recover its
amortized cost. [MoneyGram] utilizes a buy
and hold strategy for [the Portfolio], and
generally does not utilize [the Portfolio] for
liquidity purposes. While this strategy does
not factor into the pricing of securities, it
does factor into [MoneyGram's] assessment of
other-than-temporary impairments. [MoneyGram]
believes that if cash flows continue to
perform as expected, [it] will be able to
recover its amortized cost prior to or upon
maturity or call of the security.

(<u>Id.</u> ¶ 239.) MoneyGram cautioned, however, that some of its judgments made in the impairment review process could be erroneous and that it might later experience realized losses by determining that securities considered temporarily impaired were actually OTTI. (<u>Id.</u>)

The 3Q07 10-Q also stated that MoneyGram's shift towards investing more heavily in short-term securities enhanced the Portfolio's liquidity and reduced its use of repurchase agreements. As a result, by the end of 3Q07 MoneyGram had no outstanding amounts under the repurchase agreements. (<u>Id.</u> ¶ 242(3); Puls Aff. Ex. O at 32.)

25

Finally, MoneyGram affirmed its hiring of JP Morgan to complete a strategic review of the Payment Systems segment, including review of "the [P]ortfolio strategy and capital implications," confirmed the $197.0 million credit facility draw down, disclosed a commitment letter it had obtained from JP Morgan Chase Bank on October 31, 2007, for a $150.0 million 364-day unsecured revolving credit facility and noted that further credit rating downgrades may give two of its largest financial institution customers the right to terminate their contracts. (Puls Aff. Ex. O at 23, 33, 35, 37.) MoneyGram specifically cautioned that the outcome of JP Morgan's strategic review might change its determination that some of the Portfolio's securities were only temporarily impaired and cause it to recognize realized losses through impairment charges on the income statement. (Id. at 42.) In addition, the 3Q07 Form-10Q contained the required SOX certifications from Milne and Parrin. (Compl. ¶ 241.)

On November 8, 2007, Euronet, a MoneyGram competitor, sent a letter to Milne expressing an interest in purchasing MoneyGram. MoneyGram did not immediately disclose the letter to the public. (Id. ¶ 244.) Unrelated to the Euronet letter, Moody's downgraded MoneyGram's credit rating to junk status on November 16, 2007, and MoneyGram's stock price fell 7.4 percent. (Id. ¶ 245.)

On December 4, 2007, MoneyGram received a second letter from Euronet offering to buy MoneyGram in a stock-for-stock transaction

at a forty-three percent premium. (<u>Id.</u> ¶¶ 256-57.) After a board meeting a week later, MoneyGram responded that it would enter discussions with Euronet upon "the execution of a mutual confidentiality and standstill agreement." (<u>Id.</u> ¶ 257.) Euronet rejected MoneyGram's conditions the following day. On December 13, 2007, after Euronet threatened to go public with its offer, MoneyGram issued a press release[16] commenting on the letter, discussing Euronet's offer and MoneyGram's response, noting that JP Morgan's strategic review continued, revealing that MoneyGram was discussing financing alternatives with potential investors and stating that:

> *MoneyGram has not yet concluded its valuation of [the Portfolio] as of November 30, 2007. As previously disclosed, MoneyGram's comments regarding its financial results for the full year 2007 are subject to risks including the risk of additional material changes in the market value of securities and/or permanent impairments of [P]ortfolio securities. As a result, investors should not expect that MoneyGram's financial results will be consistent with its previously announced 2007 outlook.*

(Compl. ¶¶ 256-57.) MoneyGram's stock price rose 15.9 percent after disclosure of Euronet's offer. (<u>Id.</u> ¶ 258.)

---

[16] MoneyGram filed the press release in a Form 8-K. (Puls Aff. Ex. Q.)

On December 21, 2007, MoneyGram issued another press release[17] in the form of a letter from Milne to one of MoneyGram's investors who was upset about MoneyGram's refusal to consider Euronet's offer.  The press release specified that the strategic review of the Payment Systems segment included consideration of the future of the segment itself, Portfolio valuation in a "dislocated market," adjustment of the Portfolio's strategy and optimization of financial flexibility to support the money transfer business. (Compl. ¶ 263.)  Further, as part of the strategic review, MoneyGram would provide "additional disclosure and transparency surrounding the [Portfolio] and Payment Systems business." (Id.) Referring to the Euronet proposal, the press release commented that MoneyGram refused "to engage in a public dialogue" because it was not the proper way to communicate, nor did it serve the shareholders' best interests.  (Id.)  Finally, the press release stated:

> We believe our core business is very strong and provides significant growth opportunities in the future.  We recognize that the uncertainty surrounding [the Portfolio] has affected our stock price and it is no surprise to see prospective buyers view this as an opportunity to acquire our business at a value that might be less than what our shareholders deserve.  We remain open to genuine proposals from third parties when we can explore them on

---

[17] MoneyGram filed the press release in a Form 8-K.  (Puls Second Aff. Ex. T.)

> *terms that provide us the ability to maximize*
> *shareholder value.*

(Id.)

Beginning on December 21, 2007, the SEC requested information related to the 2006 10-K and 3Q07 10-Q. (Id. ¶ 265.) As part of that inquiry, the SEC seized the records, computers and notes from MoneyGram's investment department on an unidentified date in winter 2007. (Id.)

On January 14, 2008, the last day of the class period, MoneyGram issued a press release[18] updating the Portfolio's status, identifying a potential investor, discussing the investment negotiations, addressing credit facilities and announcing the conclusion of the strategic review of the Payment Services segment. (Compl. ¶ 270.) With respect to the Portfolio, MoneyGram announced completion of its November 30, 2007, valuation, which resulted in $571.0 million in additional unrealized losses due largely to the deterioration in value of ABS that "*were negatively impacted by changes in the credit ratings of the securities or the[ir] underlying collateral.*" (Id.) MoneyGram further disclosed that in January 2008 it sold $1.3 billion of the Portfolio's securities, resulting in approximately $200 million in realized losses. According to MoneyGram, those losses, combined with significant anticipated future realized and unrealized losses, did not

---

[18] MoneyGram filed the press release in a Form 8-K. (Puls Aff. Ex. R.)

immediately affect its cash flow, but created the need for long-term equity and debt capital.

Therefore, MoneyGram disclosed its exclusive negotiations with an investment group led by Thomas H. Lee Partners, L.P. ("Investors") for a comprehensive recapitalization of the company. The negotiations contemplated a capital infusion consisting of $750 to $850 million in equity from the Investors and $550 to $750 million in debt from third parties that would add to the $350 million outstanding or available under MoneyGram's then-existing credit agreement.  The Investors' equity infusion was expected to result in a sixty to sixty-five percent initial equity interest in MoneyGram.   The transaction was conditioned on MoneyGram's liquidation of a significant portion of the Portfolio's ABS, MBS and CDO, with the resulting portfolio being comprised primarily of highly liquid assets.  (_Id._)  The following day, MoneyGram's stock price fell 49.5 percent, and by January 22, 2008, that number had risen to 66 percent.  (_Id._ ¶ 272.)

## III.  Post-Class Period

On February 12, 2008, MoneyGram announced in a press release that it had reached an agreement with the Investors for a comprehensive recapitalization of the company.  (_Id._ ¶ 273.)  In addition to detailing the recapitalization, the press release noted

that MoneyGram had sold an additional $500 million of the Portfolio's securities, resulting in realized losses of $180.0 million. (*Id.*)

MoneyGram requested an extension of time to file its 2007 Form 10-K ("2007 10-K") on February 29, 2008, noting that its accounting and finance departments had devoted significant time and resources to "*comprehensive recapitalization and other matters.*" (*Id.* ¶ 274.) The request further predicted that MoneyGram expected to record $1.2 billion in other than temporary impairments for the quarter ended December 31, 2007 ("4Q07"). (*Id.*)

MoneyGram announced an amended agreement with the Investors on March 10, 2008, due to MoneyGram's failure to meet certain conditions in the earlier agreement. (*Id.* ¶ 277.) That announcement also reported that MoneyGram, as required by the earlier agreement, sold certain Portfolio securities at a "*total loss of approximately $1.6 billion, including $1.2 billion of other-than-temporary impairments recorded in the fourth quarter 2007 as a charge to earnings and realized losses of approximately $350 million in the first quarter of 2008.*" (*Id.*) On March 17, 2008, another MoneyGram press release indicated that the $1.6 billion in losses caused it to fall out of "*compliance with the minimum net worth requirements of the states in which it is licensed to conduct its money transfer and other payment services business.*" (*Id.* ¶ 278.) The comprehensive recapitalization was

31

successfully completed on March 25, 2008.  (Id. ¶ 279.)  That same day, MoneyGram filed its 2007 10-K, noting that the SEC's inquiry had become a formal investigation into MoneyGram's financial statements and other disclosures.  (Id. ¶ 280.)

After the market closed on March 28, 2008, Rock, Ford and Kiernan tendered their resignations effective March 25, 2008.  (Id. ¶ 283.)  MoneyGram's board of directors eliminated the finance and investment committee on April 25, 2008.  (Id.)  MoneyGram announced the resignations of Putney and Milne on April 8, 2008, and June 19, 2008, respectively.  (Id. ¶¶ 284-85.)  As of October 3, 2008, the date the complaint was filed, MoneyGram's stock was trading at $1.41 per share.  (Id. ¶ 287.)

Beginning in March 2008, four securities class action complaints were filed in this district.  On July 22, 2008, the court consolidated these actions and named Oklahoma Teachers' Retirement System lead plaintiff.  Lead plaintiff filed the amended consolidated class action complaint on October 3, 2008.  The complaint asserts a claim against all defendants pursuant to § 10(b) of the Exchange Act and SEC Rule 10b-5, alleging that they deceived the investing public, artificially inflated and maintained the market price of MoneyGram's publicly-traded securities and caused lead plaintiff and other class members to purchase those securities at the inflated prices.  The complaint further alleges "controlling person" claims against the individual defendants

pursuant to § 20(a) of the Exchange Act.   Defendants now move to dismiss the action pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), and the Private Securities Litigation Reform Act of 1995 ("Reform Act"), 15 U.S.C. § 78u-4.

## DISCUSSION

### I.   Standard of Review

A complaint typically must contain only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  This statement does not require detailed factual allegations so long as it "give[s] the defendant fair notice of what the ... claim is and the grounds upon which it rests."  Conley v. Gibson, 355 U.S. 41, 47 (1957).   A court generally accepts all facts and inferences in a light most favorable to the plaintiff and will dismiss the complaint pursuant to Rule 12(b)(6) only if its allegations fail "to raise a right to relief above the speculative level."   Bell Atlantic Corp. v. Twombly, 550 U.S. 554, 555 (2007).  In § 10(b) and Rule 10b-5 actions, however, the Reform Act requires the complaint to identify the allegedly false statements or omissions of material fact and explain why they were misleading.   15 U.S.C. § 78u-4(b)(1) Moreover, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  Id. § 78u-4(b)(2).

## II.   Securities Fraud

### A.   Section 10(b) Claim

Section 10(b) of the Exchange Act prohibits the use of "any manipulative or deceptive device or contrivance" in violation of the SEC's rules and regulations "in connection with the purchase or sale of any security." Id. § 78j(b).  SEC Rule 10b-5 makes it unlawful "for any person ... to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5.  To state a claim under § 10(b) and Rule 10b-5, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 128 S. Ct. 761, 768 (2008) (citation omitted).  Defendants argue that the complaint does not adequately allege any misrepresentations or omissions, facts giving rise to a strong inference of scienter or loss causation.

### 1.   GAAP Violations

Lead plaintiff maintains that violations of GAAP by MoneyGram support its misrepresentation and scienter allegations.

34

Specifically, lead plaintiff alleges that GAAP violations during the class period caused MoneyGram to misrepresent its comprehensive income, unrestricted assets and shareholders' equity. (Compl. ¶¶ 119(1), 124(1), 138(1), 143(1), 163(1), 174(1), 217(1), 242(1), 437, 440.) Lead plaintiff also asserts that MoneyGram violated GAAP through certain nondisclosures. (<u>Id.</u>)

"GAAP are the official standards adopted by the American Institute of Certified Public Accountants," and derive from nineteen sources that are organized into a five-level hierarchy to determine the appropriate accounting treatment in a given situation. <u>In re K-Tel Int'l, Inc. Sec. Litig.</u>, 300 F.3d 881, 889-90 (8th Cir. 2002) (quotation omitted); <u>see also</u> <u>Bolt v. Merrimack Pharm., Inc.</u>, 503 F.3d 913, 917 n.6 (4th Cir. 2007). Financial Accounting Standards ("FAS") published by the FAS Board ("FASB") and SEC rules are at the top of that hierarchy, consensus positions of the FASB Emerging Issue Task Force ("EITF") are in the third level, FASB Staff Positions ("FSP") are in the fourth level and FASB Statements of Financial Accounting Concepts ("Concepts") are at the bottom. <u>See</u> <u>Bolt</u>, 503 F.3d at 917 n.6; Mark J. Hanson, <u>Becoming One: The SEC Should Join the World in Adopting the International Financial Reporting Standards</u>, 28 Loy. L.A. Int'l & Comp. L. Rev. 521, 552 n.223 (2006). GAAP are not "a canonical set of rules." <u>K-Tel</u>, 300 F.3d at 890. Instead, they are "general principles" that "tolerate a range of 'reasonable' treatments,

leaving the choice among alternatives to management." Id. (quotations omitted).

The complaint generally maintains that defendants violated GAAP related to MoneyGram's (1) fair value determinations and method for making those determinations, (2) impairment review process and the results of that process and (3) disclosures about the Portfolio's risk exposure. (See Compl. ¶¶ 119(1), 124(1), 138(1), 143(1), 163(1), 174(1), 217(1), 242(1), 437-97.)

### a. Fair Value

Lead plaintiff first argues that MoneyGram overstated the fair value of the Portfolio's AFS securities in violation of FAS 115, which requires that periodic unrealized losses in the fair value of AFS securities because of temporary impairments be recorded and recognized in comprehensive income on the balance sheet. (Id. ¶¶ 441-42; see also, e.g., id. ¶¶ 119(1)(b), 138(1)(a).) Lead plaintiff relies on the following allegations to support its argument: (1) the market for MBS and ABS had declined conspicuously since mid-2006 and continued its decline throughout the class period; (2) credit rating agencies downgraded certain MBS in the first half of 2007 and several subprime mortgage originators declared bankruptcy; (3) MoneyGram's unrealized losses substantially increased throughout 2007; (4) credit ratings agencies downgraded additional ABS in September and October 2007 and banks in the United States wrote down the fair value of

billions of dollars of ABS; (5) MoneyGram amended its credit agreement with JP Morgan Chase Bank at the beginning of January 2008 in contemplation of experiencing more than $1.5 billion in unrealized losses on the Portfolio's securities in 2007; (6) MoneyGram eventually recognized $1.2 billion in unrealized losses for 2007; and (7) MoneyGram's recognition of unrealized losses on the Portfolio's AFS securities lagged behind the market. (Id. ¶¶ 443-47.)  These allegations are deficient in several respects.  First, the allegations do not directly connect the general external market conditions and ratings downgrades to the actual ABS, MBS and CDO in the Portfolio.  Second, the crescendo in unrealized losses during 2007 may merely have reflected the growing deterioration of the market.  Third, the complaint does not identify market participants with securities of similar kind and quality whose recognition of unrealized losses substantially differed from MoneyGram's.  Nevertheless, as discussed below, the court determines that other allegations in the complaint permit an inference that MoneyGram overstated the fair value of the Portfolio's AFS securities and thus violated FAS 115 by not timely and adequately recognizing unrealized losses on the Portfolio's MBS and other ABS.

The complaint further asserts that MoneyGram violated GAAP by concealing (1) its fair value determination method until the 3Q07 10-Q, (2) the specifics of its disagreements with third-party

pricers until after the class period,[19] (3) its disagreements with broker pricing, (4) the growing necessity for internal pricing due to the illiquidity of the market for the Portfolio's securities and (5) the difficulty of internal pricing. (Id. ¶¶ 449, 451, 458; see also, e.g., id. ¶ 119(1)(a).)  Of the five GAAP identified in the complaint, three are Concepts that are too general to permit a meaningful assessment of whether MoneyGram's fair value determination method and its omissions related to that method violated GAAP.[20]  The remaining two GAAP are FAS 107 and FAS 115, which allegedly "require disclosure of the major types and maturities of securities in the [Portfolio]." (Id. ¶ 454.)  These GAAP, however, do not address lead plaintiff's allegations related to MoneyGram's fair value determination method and the lack of

---

[19] In response to an SEC inquiry, MoneyGram disclosed in a March 3, 2008, letter that in the 3Q07 10-Q it priced thirteen securities differently from the third party pricers.  MoneyGram's $85.2 million fair value determination for those securities was $14.2 million higher than that of the third parties.  (Id. ¶ 451.)

[20] The Concepts note, among other things, that "the primary objective of financial reporting is to provide information that is useful to current and potential investors," "relevance and reliability are the two primary qualities that make accounting information useful for decision-making," neutrality is an element of reliability, and "expectations of an entity's management are often useful and informative, [but] the marketplace is the final arbiter of asset and liability values."  (Id. ¶¶ 452-53, 455.)

disclosures related to the use of that method.  Therefore, the complaint's allegations do not support violation of GAAP based on MoneyGram's fair value determination method and related omissions.[21]

### b.   Impairments

FAS 115 also requires a periodic review of securities that experience unrealized losses to determine whether those securities are OTTI.  Securities deemed OTTI must be identified as realized losses in net income during the period in which the impairment occurred.  (See id. ¶ 462; see also id. ¶ 465 (referring to EITF Issue No. 99-20).)  FSP 115-1 and 124-1 note that if fair values are not readily determinable, an investor should consider certain impairment indicators, including "(1) a significant deterioration in the earnings performance, credit rating, asset quality, or business prospects of the investee, (2) a significant adverse change in the regulatory, economic, or technological environment of the investee, and (3) a significant adverse change in the general market condition of [the] industry in which the investee operates." (Id. ¶¶ 463-64.)

Lead plaintiff argues that MoneyGram violated GAAP in 2Q07 and 3Q07 because its impairment review process failed to timely identify OTTI securities.  (See id. ¶ 461; see also, e.g., id.

---

[21] The complaint also alleges that MoneyGram violated GAAP by overstating its unrestricted assets during 1Q07, 2Q07 and 3Q07 by overstating the fair value of the AFS securities.  (Id. ¶ 473-79.) This allegation, however, is included in the court's discussion of FAS 115 above.

¶ 138(c).)  Specifically, lead plaintiff alleges that the three impairment indicators were present during 2007 and that MoneyGram should have recognized additional other-than-temporary impairments before 4Q07.  This argument is subject to the same deficiencies described above with respect to MoneyGram's fair value determinations.  Again, however, as discussed below, the court concludes that the complaint's other allegations permit an inference that MoneyGram's application of, or deviation from, the impairment review process resulted in a failure to timely recognize some of the Portfolio's securities as OTTI.[22]

The complaint further alleges that MoneyGram violated GAAP and the disclosure requirements of SEC Form 8-K during 2Q07, 3Q07 and 4Q07 by not timely disclosing impairments to its AFS securities. A Form 8-K must be filed within four business days of an event triggering its disclosure requirements.  The impairment of securities under GAAP is a triggering event that requires, among other things, disclosure of the date a company concluded a material change of the securities' status was required and a description of

---

[22] The complaint also maintains that MoneyGram knew before its 3Q07 financial disclosures that it lacked the intent and ability to hold the impaired securities to maturity and thus violated GAAP by falsely claiming otherwise. (Id. ¶¶ 468-70.)  If MoneyGram's 3Q07 statement regarding its intent and ability to hold the impaired securities was false, however, it is irrelevant that those statements also violated GAAP.  GAAP violations are instructive only to the extent they evince fraud.  Accordingly, the court considers the facts supporting this allegation in its general discussion of falsity and scienter below.

the impaired assets and the circumstances leading to that determination. (Id. ¶ 492.) Lead plaintiff argues that MoneyGram's monthly impairment review process should have revealed "large and growing" impairments to the Portfolio's AFS securities, particularly in October 2007, and that those impairments should have been disclosed in a Form 8-K. As noted above, the complaint's allegations permit an inference that MoneyGram should have recognized earlier impairments. The complaint, however, contains no allegations that MoneyGram concluded a security was impaired and failed to disclose that impairment. Absent such allegations, the complaint does not support a violation of GAAP based upon a failure to file a timely Form 8-K.[23]

### c.   Risk Exposure

Lead plaintiff further alleges that MoneyGram violated GAAP throughout the class period by (1) failing to adequately disclose the Portfolio's exposure to the market value decline for MBS and other ABS, (2) using only the highest rating of split agency ratings and (3) partially concealing the manner in which risk exposure drove unrealized losses. (Id. ¶¶ 480, 484, 486-87; see also, e.g., id. ¶ 119(1)(c).)   The complaint again relies on two

---

[23] Lead plaintiff also asserts that MoneyGram had a duty to disclose in a Form 8-K the September 24, 2007, draw down of its senior credit facility. (Id. ¶¶ 217(1)(g), 242(1)(g), 496.) The complaint, however, does not identify a SEC rule requiring such disclosure. Therefore, this allegation does not support a violation of GAAP.

Concepts that are too general to permit a meaningful and useful determination of whether MoneyGram's conduct violated GAAP. (See id. ¶¶ 481-82.) The remaining GAAP are FAS 107 and FAS 115, which, as stated earlier, allegedly "require disclosure of the major types and maturities of securities in the [Portfolio]." (Id. ¶ 483.) FAS 107 additionally recommends disclosure of quantitative information about the market risks to securities. (Id.)

Throughout the class period, however, MoneyGram disclosed the "major types" of securities in the Portfolio – namely, CMBS, RMBS and other ABS – and there is no indication that GAAP required more specific disclosures. Moreover, MoneyGram's ratings disclosures and alleged concealment of the effect of the Portfolio's exposure to the subprime and Alt-A mortgage market on unrealized losses do not relate to the disclosure of "major types" of securities.[24]

---

[24] To support its contention that MoneyGram failed to fully disclose how risk exposure drove unrealized losses, the complaint selectively quotes from the 3Q07 10-Q and concludes that MoneyGram "failed to acknowledge that the market-based liquidity discounts and risk premia were largely because of the growing numbers of mortgage delinquencies and defaults." (Id. ¶¶ 488-89.) The quoted language, however, omits MoneyGram's statements in the same paragraph that the "unrealized losses were caused by a general lack of liquidity in the [ABS] market and deterioration in the broader credit market," which was "triggered by concerns surrounding subprime [MBS], but also extended to other [ABS] in the market." (Puls Aff. Ex. O at 13.) In addition, in the middle of the cited paragraph, the complaint omitted MoneyGram's recognition that "[m]arket conditions at September 30, 2007 primarily reflect wider credit spreads due to heightened concerns regarding the risk of securities backed by mortgage-based collateral, historically low levels of activity in the related market for these securities and a tighter credit market." (Id.) The significance of the
(continued...)

Therefore, these allegations do not support violation of GAAP.

## 2.   Misrepresentations and Omissions

Mere allegations of fraud do not satisfy the Reform Act's falsity pleading requirements. In re Hutchinson Tech., Inc., Sec. Litig., 536 F.3d 952, 958 (8th Cir. 2008) (citation omitted). Rather, the circumstances of alleged fraud must be particularly stated so as to include matters such as the time, place and contents of the representations, the identity of the person who made the statement and what he or she obtained or gave up by making the statement - in other words, the "'who, what, when, where, and how.'" K-Tel, 300 F.3d at 890 (quoting Parnes v. Gateway 2000, Inc., 122 F.3d 539, 549-50 (8th Cir. 1997)). The complaint must also "indicate why the alleged misstatements would have been false or misleading at the several points in time in which it is alleged they were made." In re Cerner Corp. Sec. Litig., 425 F.3d 1079, 1083 (8th Cir. 2005). Merely alleging "that defendants made statements 'and then showing in hindsight that [they were] false'" does not satisfy the Reform Act. Elam v. Neidorff, 544 F.3d 921, 927 (8th Cir. 2008) (quoting In re Navarre Corp. Sec. Litig., 299 F.3d 735, 743 (8th Cir. 2002)). Similarly, alleging only that disclosures "in one report should have been made in earlier reports do[es] not make out a claim of securities fraud." K-Tel, 300 F.3d

---

[24](...continued)
complaint's omissions suggests a deliberate attempt to distort the record.

at 891 (quotation omitted).   Instead, the Reform Act requires allegations of "facts or further particularities that, if true, demonstrate that the defendants had access to, or knowledge of, information contradicting their public statements when they were made." Navarre, 299 F.3d at 742.

A duty to disclose information "arises only when (1) a regulation, statute or rule requires disclosure; (2) disclosure is required to prevent a voluntary statement from being misleading; or (3) the defendants are engaging in insider trading." K-Tel, 300 F.3d at 897.   A company need not disclose all material information. Id. at 898 (citing In re Sofamor Danek Group, Inc., 123 F.3d 394, 400 (6th Cir. 1997)).   Nevertheless, even in the absence of a duty to disclose, a company that makes material representations "assumes a duty to speak fully and truthfully on those subjects." Id. (quotation omitted); see also Kushner v. Beverly Enters., 317 F.3d 820, 831 (8th Cir. 2003).   An omission is material "if there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" In re Amdocs Ltd. Sec. Litig., 390 F.3d 542, 548 (8th Cir. 2004) (quoting Basic, Inc. v. Levinson, 485 U.S. 224, 232 (1988)).   A duty to disclose, however, does not require a company to "dump all known information with every public announcement." K-Tel, 300 F.3d at 898 (quotation omitted).   "The central issue is

44

... whether defendants' representations, taken together and in context, would have misled a reasonable investor." In re NVE Corp. Sec. Litig., 551 F. Supp. 2d 871, 881 (D. Minn. 2007) (quotation omitted), aff'd, 527 F.3d 749 (8th Cir. 2008). Clear violations of GAAP support falsity. See In re Stellent, Inc. Sec. Litig., 326 F. Supp. 2d 970, 981-82 (D. Minn. 2004).

The complaint contains a series of cascading alleged misrepresentations and omissions beginning with the January 24, 2007, press release and conference call and ending with the 3Q07 10-Q.   In addition, the complaint asserts distinct misrepresentations related to the December press releases.

Specifically, the complaint repeatedly maintains that defendants affirmatively misrepresented MoneyGram's financials by overstating the fair value of the Portfolio's AFS securities and understating the OTTI securities during the first three quarters of 2007.   Lead plaintiff additionally claims that Parrin and Milne signed false SOX certifications in the 2006 10-K and 1Q07, 2Q07 and 3Q07 10-Qs.   Further, the complaint contains a repetitive core of alleged omissions related to defendants' failures to disclose (1) MoneyGram's potential loss of financial institution customers upon a ratings downgrade, (2) the Portfolio's exposure to subprime and Alt-A collateral, (3) the specific identity of the Portfolio's

securities, (4) MoneyGram's fair value determination method and (5) the Portfolio's AFS securities' ratings and method for reporting those ratings (collectively "material omissions").

As an initial matter, the court determines that, with the few exceptions discussed below, the complaint adequately alleges specific misleading statements and omissions. The court further determines that the complaint alleges facts giving rise to an inference that defendants misstated MoneyGram's financials throughout the class period by overstating the fair value of the Portfolio's AFS securities and understating the number of OTTI securities. Lead plaintiff's allegations in support of these misrepresentations focus on an increasing number of external market indicators, which alone do not permit an inference that defendants misrepresented the Portfolio's financial condition. Indeed, these allegations resemble "the very essence of pleading fraud by hindsight [that] the [Reform Act] is designed to prevent." In re Patterson Cos., Inc. Sec., Derivatives & ERISA Litig., 479 F. Supp. 2d 1014, 1030 (D. Minn. 2007). Moreover, MoneyGram's outside auditor concluded that MoneyGram's financial statements during the class period "present[ed] fairly, in all material respects, [MoneyGram's] financial position." (Puls Aff. Ex. A at F-4.)

Significantly, however, the complaint alleges that MoneyGram's general accounting ledger remained open throughout the class period in violation of internal controls because of problems associated

46

with timely and accurately valuing the Portfolio's ABS.[25]  (See Compl. ¶¶ 366, 369, 372, 374-75.)  By leaving the general ledger open, defendants could alter MoneyGram's financial information retroactively without having to go through an otherwise required "'very detailed' process that included a significant amount of documentation (and appropriate signatures) to properly track any adjustments that were made after the end of a reporting period." (Id. ¶ 374.)  This significant violation of MoneyGram's internal controls permits an inference that defendants had access to valuation information contradicting the public financial statements and left the general ledger open to facilitate later alteration of MoneyGram's financials.  In addition, the alleged internal controls violation supports the complaint's alleged SOX violations.  The court addresses the remaining allegations chronologically and with consideration of the information actually disclosed.

### a.   2006 and First Two Quarters of 2007

### i.   2006 Financials

The complaint alleges a duty to disclose the material omissions in the January 24, 2007, press release and earnings conference call, and the 2006 10-K that was signed by all of the individual defendants except Putney.  (See id. ¶ 543.)  The court

---

[25] According to the complaint, the general ledger was closed in May 2007 pursuant to direction from MoneyGram's outside auditor. (Compl. ¶ 373.)  Nevertheless, the general ledger allegedly "remained open on an ongoing basis throughout the class period and into 2008."  (Id.)

first determines that the statements by Milne and Parrin on January 24 were too vague and generalized to have significantly altered the total mix of available information.   In addition, the earnings information and predictions in the press release did not establish a duty to disclose information related to the material omissions.[26] Accordingly, these statements do not support the alleged material omissions.   The 2006 10-K, however, requires a more detailed analysis.

Lead plaintiff maintains that the document's reference to the effect of a ratings downgrade on MoneyGram's ability to retain existing customers misleadingly omitted the fact that two of its largest financial institution customers had a right to terminate their contracts if MoneyGram's credit rating fell below investment grade.   Although the 10-K did not provide specifics about the effect of a potential ratings downgrade on its contracts, such an omission would not have misled a reasonable investor.   Rather, a reasonable investor should expect that the downgrade of a company's credit rating below investment grade would have a material adverse effect on that company's business relationships.   Accordingly, this omission does not support a claim for securities fraud.

The omissions related to the Portfolio's exposure to the subprime and Alt-A mortgage markets and the identity of the

---

[26] As discussed earlier, whether the financial information disclosed in the press release was misleading remains an open question.   The same remains true for the quarterly press releases.

Portfolio's AFS securities can be considered together.  The 2006 10-K indicated that MoneyGram's unrealized losses resulted from temporary market conditions instead of fundamental weaknesses in the issuer's credit quality, the underlying assets or the expected cash flow from the investments, and that MoneyGram had the intent and ability to hold the temporarily impaired securities to maturity.  Lead plaintiff asserts that MoneyGram was required to disclose detailed information about the Portfolio's securities and their exposure to the subprime and Alt-A mortgage markets in March 2007 to prevent this statement from being misleading.  Considering the external market indicators alleged in the complaint, MoneyGram's internal problems valuing the Portfolio's AFS securities - as evidenced by the general ledger remaining open on a monthly basis beginning in January 2007 - and the importance of the Portfolio to MoneyGram's solvency and ability to meet its payment service obligations, the court determines that a failure to disclose such information may have caused MoneyGram's statements to mislead a reasonable investor.  Therefore, the complaint adequately alleges that defendants had a duty to provide more detailed information in the 2006 10-K regarding the Portfolio's AFS securities and their exposure to subprime and Alt-A collateral.

With respect to the alleged material omission regarding MoneyGram's fair value determination method, the 2006 10-K stated that MoneyGram generally priced its Portfolio's AFS securities

based upon "quoted market prices," but that its management valued investments that were not readily marketable. At this time, MoneyGram also cautioned that internal pricing required significant management judgment and did not necessarily reflect the price that could have been obtained in a current market exchange. MoneyGram, however, provided no specifics about how and from whom it obtained "quoted market prices," or the number of securities requiring management pricing. The complaint alleges that this was misleading because (1) MoneyGram used third-party pricers and brokers to value the Portfolio's AFS securities, (2) "quoted market prices" were only one factor considered in the third-party valuations and (3) MoneyGram used internal pricing as a result of third parties' refusal to price the investments or management's disagreement with third party pricing. Again, the external market indicators, MoneyGram's failure to close the general ledger and the reliance on fair value determinations to assess MoneyGram's unrestricted assets and ability to fulfill the payment service obligations supports a duty to disclose the specifics of MoneyGram's fair value determination method in the 2006 10-K.

Finally, lead plaintiff alleges that, because of the importance of the ratings of the Portfolio's AFS securities to their valuation, MoneyGram had a duty to fully disclose those ratings and its method for reporting and using split agency ratings. For the same reason that MoneyGram's failure to disclose

50

additional information about its fair value determination method may have misled a reasonable investor, the court determines that the complaint's allegations support a duty to disclose specific information about the Portfolio's AFS securities' ratings and method of reporting those ratings.

### ii.  First Quarter 2007 Financials

The complaint next asserts that Milne's statement at the April 18, 2007, earnings conference call about managing the Portfolio "with discipline," the related press release and the 1Q07 10-Q[27] contained the same general material omissions as the earlier challenged statements.[28]  (See id. ¶¶ 138, 143.)  Consistent with the 2006 financials, the court determines that: (1) there is no substantial likelihood that a reasonable investor would have considered Milne's statement at the earnings conference call to have altered the total mix of available information; (2) the press release did not establish a duty to disclose the alleged material

_____

[27] All of the 10-Qs were signed by Milne, Parrin and Benson. (See id. ¶ 543.)

[28] The complaint also asserts that the statement made at the March 7, 2007, conference call and presentation related to "headline risk" contained the same material omissions as the January 24, 2007, press release and the 2006 10-K.  In addition, the complaint asserts that "[c]ontrary to defendants' statements, MoneyGram's investment securities were subject to the same 'headline risk' and market conditions generally facing ABS."  (Id. ¶ 124(8).)  The complaint, however, fails to identify the MoneyGram representative that made the alleged statement.  (See id. ¶ 123.)  Therefore, this allegation does not satisfy the Reform Act's particularity requirement and thus does not support lead plaintiff's claim.

omissions; and (3) the complaint adequately alleges the same material omissions related to the 1Q07 10-Q as it does to the 2006 10-K.

### iii.  Second Quarter 2007 Financials

Lead plaintiff further contends that the July 18, 2007, press release and conference call regarding 2Q07 financials and the 2Q07 10-Q were misleading because of the material omissions. The complaint also adds two omissions to its cascade of alleged misrepresentations. First, the complaint maintains that MoneyGram failed to disclose information related to the management by its wholly-owned subsidiary, Long Lake Partners, LLC, of a pool of ABS CDO ("Stillwater fund") that S&P identified in July 2007 as being materially exposed to subprime RMBS and placed on credit watch negative. (Id. ¶ 163(10).) Second, the complaint avers that MoneyGram failed to disclose a shift in its Portfolio investment strategy away from ABS and toward cash and cash equivalents to enhance the Portfolio's liquidity. (Id. ¶ 163(11).)

Similar to the 2006 and 1Q07 financial disclosures, the court determines that the 2Q07 press release did not establish a duty to disclose the alleged material omissions. Parrin's statements at the earnings conference call and the 2007 10-Q, however, specifically addressed the Portfolio's exposure to the faltering subprime mortgage market. Thus, a duty existed to disclose enough information related to the Portfolio's exposure to that market to

prevent from being misleading (1) Parrin's statements that the market downturn had had "very little impact" on the Portfolio's securities because they were "typically A rated or better" and that any impairments would be temporary, and (2) the 10-Q's similar statements about the Portfolio's subprime exposure.  For the same reasons that the 2006 10-K may have contained material omissions, the court determines that the failure to disclose more detailed information about the Portfolio's content and exposure to the subprime and Alt-A market, as well as MoneyGram's method for reporting credit ratings and fair value determination method, may have misled a reasonable investor.  Moreover, although no allegations indicate that the Stillwater fund contained securities similar to the Portfolios's, there is a substantial likelihood that disclosure of S&P's determination would have significantly altered the total mix of information available, and that concealing the Stillwater fund's exposure to subprime RMBS may have misled a reasonable investor.  The same is also true for MoneyGram's change in the Portfolio's investment strategy.  Accordingly, the court determines that the complaint adequately alleges material omissions at the July 18 conference call and in the 2Q07 10-Q.

### b.    Third Quarter 2007 Financials

#### i.    Press Release and Conference Call

The complaint also alleges various misrepresentations and omissions related to the October 17, 2007, press release and

earnings conference call.[29]   The press release referred to the Portfolio's unrealized losses, the illiquidity in the subprime market, retention of JP Morgan to conduct a strategic review of the Payment Services segment and the senior credit facility draw down. At the conference call, Parrin commented that the Portfolio's securities were not essential for daily liquidity.   Parrin also mentioned MoneyGram's fair value determination method, indicating that MoneyGram applied "a very disciplined" GAAP-compliant approach that did not permit MoneyGram to price securities at its discretion, and briefly discussed the impairment review process. Moreover, Milne noted that the Portfolio was "still performing," the strategic review might affect MoneyGram's investment strategy and no ratings downgrades of securities had directly affected the Portfolio.   The complaint alleges that these statements established a duty to disclose all of the earlier discussed omissions in addition to the following: (1) in September 2007 Benson was tasked with leading a team to review whether the Portfolio's condition required MoneyGram to seek bankruptcy protection; and (2) JP Morgan's strategic review of the Payment Systems segment included reviewing the future of the segment itself, the valuation of the

---

[29] Lead plaintiff's opposition memorandum identifies Milne's September 11, 2007, presentation as containing false statements. (Pl. Br. at 11.)   The complaint, however, contains no specific allegations related to that presentation.   Therefore, lead plaintiff has not sufficiently pleaded misrepresentations or omissions related to Milne's September 11 presentation.

Portfolio in a "dislocated" market, adjustments to investment strategy and optimization of financial flexibility to support MoneyGram's growing money transfer business.[30] (See Compl. ¶ 217.)

Unlike the earlier press releases and earnings conference calls, the statements made related to 3Q07 referenced unrealized losses, the Portfolio's exposure to the subprime market, the fair value determination method and the impairment review process. Therefore, for the same reasons discussed earlier, the court determines that a reasonable investor may have been misled by the concealment of specific information related to the Portfolio's subprime exposure and contents, the fair value determination method, MoneyGram's use of credit ratings, the Stillwater fund and a change in the Portfolio's investment strategy. Moreover, concealing MoneyGram's need to explore bankruptcy because of the Portfolio's growing illiquidity and failing to fully disclose the extent of JP Morgan's strategic review may have misled a reasonable investor.

Finally, the complaint alleges two additional affirmative misrepresentations. First, the complaint alleges that the press

---

[30] The complaint also adds a fourth alleged omission related to MoneyGram's realignment of the Portfolio away from long-term, high risk, high-yield investments to short-term lower yield government securities, cash and cash equivalents, which allegedly would not provide the return necessary to cover MoneyGram's "spread." (See id. ¶ 217(12).) The court considers this to be an expansion on the alleged omission regarding MoneyGram's shift in investment strategy to ensure greater Portfolio liquidity, and treats it accordingly. (See id. ¶¶ 163(11), 174(11), 217(11).)

release falsely stated that the draw down of the senior credit facility provided "additional assurance" that MoneyGram could meet its payment service obligations, and that Parrin misrepresented the draw down as "a matter of prudence."  Lead plaintiff maintains that these statements were false because defendants knew the exhaustion of the credit facility would not satisfy MoneyGram's obligations in light of the Portfolio's impaired securities.  The court determines that the alleged failure to close the general ledger on a monthly basis, exploration of bankruptcy and scope of JP Morgan's strategic review permit an inference that defendants knew or had access to information contradicting the public statements related to the draw down of MoneyGram's senior credit facility.

Second, lead plaintiff asserts that Parrin falsely said that MoneyGram used no discretion in determining the fair value of the assets.  Parrin, however, stated that he and other MoneyGram employees did not price the securities at "our discretion."  (Id. ¶ 214.)  This does not mean they used no discretion.  Indeed, only a naive investor would believe pricing decisions involved no discretion.  Further, as MoneyGram later disclosed, the fair value determination method contained discretionary elements, as all pricing decisions must, but was not wholly discretionary.  Therefore, the complaint does not properly allege that Parrin misrepresented the use of discretion in determining a security's fair value.

### ii.  3Q07 10-Q

The complaint continues its barrage of alleged misrepresentations in connection with the 3Q07 10-Q. Specifically, lead plaintiff asserts the same general misrepresentations and material omissions as discussed above, except for those related to the loss of financial institution customers and MoneyGram's ratings method. The court treats those allegations as discussed above. In addition, the complaint acknowledges that the 3Q07 10-Q disclosed MoneyGram's fair value determination method, but alleges that it concealed MoneyGram's inability to reliably price the fifteen percent of securities requiring internal pricing and the extent and quantitative effect of MoneyGram's disagreements with third-party pricers. The court determines that both alleged omissions may have misled a reasonable investor.

Lead plaintiff further asserts additional affirmative misrepresentations related to MoneyGram's use of repurchase agreements. Specifically, the complaint alleges that MoneyGram's statement that it had no outstanding amounts under repurchase agreements at the end of 3Q07 as a result of the Portfolio's enhanced liquidity was false and misleading because (1) the "enhanced" liquidity resulted from exhausting the credit facility, not the change in Portfolio strategy; (2) MoneyGram's liquidity position was not "enhanced" as evidenced by the substantial drop in unrestricted assets even with the $197.0 million credit draw down;

and (3) the reason for not using repurchase agreements before drawing down the credit facility was because the market for such agreements was dislocated and counterparties were unwilling to accept the Portfolio's securities as collateral.   The court determines that the complaint adequately alleges that the 3Q07 10-Q's statements related to repurchase agreements were false and misleading.[31]

### c.   December Press Releases

The complaint asserts that MoneyGram's December 2007 press releases were false and misleading because (1) they failed to update or correct the Portfolio's value, the number of OTTI securities and MoneyGram's unrestricted assets, debt load and overall solvency; (2) failed to disclose specifics about MoneyGram's pricing difficulties and expected unrealized losses related to the November 30, 2007, valuation of the Portfolio; and (3) concealed the November 8, 2007, letter from Euronet.   (Id. ¶ 259.)   Lead plaintiff further alleges that the press releases falsely represented MoneyGram's reason for refusing to pursue Euronet's offer.   Instead, the complaint asserts that MoneyGram refused the offer because Euronet's due diligence would have

---

[31] The complaint also maintains that the 3Q07 10-Q falsely stated that MoneyGram "believes that there have been no material changes in our market risk since December 31, 2006, except as set forth in the filing." (Id. ¶ 242(15).) Lead plaintiff, however, does not address the exceptions, and has not adequately asserted specific misleading statements regarding market risk in the 3Q07 10-Q.

revealed (1) the overvaluation of the Portfolio; (2) MoneyGram's bankruptcy concerns; (3) the complete restructuring of the Payment Services segment and the Portfolio; and (4) the details of MoneyGram's search for a capital and debt infusion to avoid bankruptcy. (Id.)

By expressly commenting on the strategic review and the Portfolio's valuation, MoneyGram had a duty to disclose all related material information. Moreover, MoneyGram had a duty to fully and truthfully represent the reason for requiring a confidentiality and standstill agreement before pursuing negotiations with Euronet. The complaint's allegations about the continued rapid deterioration of MoneyGram's financial condition, internal bankruptcy exploration, illiquidity of the Portfolio's securities and scope of the strategic review permit an inference that MoneyGram had access to facts at the time of the press releases the disclosure of which would have significantly altered the total mix of information available to a reasonable investor. Therefore, the complaint adequately alleges that the press releases failed to disclose material information related to MoneyGram's financials and falsely represented the real reason for not pursuing negotiations with Euronet. Moreover, the court also determines that the concealment of Euronet's earlier letter was material and may have misled a reasonable investor.

The complaint finally asserts that in the December 21, 2007, press release, Milne falsely implied that Euronet's offer represented "a value that might be less than what [MoneyGram's] shareholders deserve." (Id. ¶¶ 263, 264.)   Again, the court determines that the complaint's allegations related to the illiquidity of the market for the Portfolio's securities and the related valuation problems, the scope of the strategic review, Benson's bankruptcy exploration and the pursuit of debt and equity financing permit an inference that Milne had access to facts contradicting his statement.   Therefore, the complaint adequately asserts the falsity of Milne's statement.

In sum, the court recognizes that hindsight is twenty-twenty and companies need not be clairvoyant.   See K-Tel, 300 F.3d at 891. The complaint, however, alleges facts permitting inferences that certain misrepresentations and omissions were false or misleading at the time they were made.[32]  Significantly, the complaint connects the external market "red flags" with defendants' internal recognition of the effect of those red flags on the Portfolio's

---

[32] Defendants argue that many of the complaint's alleged misrepresentations are protected forward-looking statements.   The Reform Act's safe harbor prevents forward-looking statements that are accompanied by meaningful cautionary language or that are not made with actual knowledge or falsity from forming the basis for liability under the Exchange Act.   Patterson, 479 F. Supp. 2d at 1035 (citing 15 U.S.C. § 78u-5(c)(1-2)).   The alleged misrepresentations in this case, however, are related to "historical or then-current financial conditions not afforded the protection of the safe harbor."  Id.

securities throughout the class period.  Without such a connection,

the complaint's allegations would fail as prohibited hindsight

claims.  As discussed in detail above, however, the complaint does

not merely assert that later disclosures should have been made

earlier or that later-determined facts show that earlier statements

were false.  Instead, the complaint, as it must, alleges why the

challenged statements may have been false at the time they were

made and why the asserted omissions should have been made earlier

in light of the allegedly then-existing facts.  Therefore, although

extensive, repetitive and occasionally abstruse, the complaint

adequately alleges certain material misrepresentations and

omissions by all defendants except Putney.[33]

### 3.  Scienter

The Reform Act requires a plaintiff to allege facts giving

rise to a strong inference of scienter.  See Tellabs, Inc. v. Makor

Issues & Rights, Ltd., 551 U.S. 308, 313-14 (2007).   Merely

---

[33] The complaint does not allege that Putney made any specific
misrepresentations or omissions, or that he signed any of the SEC
filings.  See In re New Century, 588 F. Supp. 2d 1206, 1223 n.16
(C.D. Cal. 2008) (quotations in press releases and signed documents
attributable to individuals being quoted and signatories of
documents).  Therefore, the court grants defendants' motion to
dismiss this claim as to Putney.  See Patterson, 479 F. Supp. 2d at
1028-29 (finding Reform Act abrogated "group pleading doctrine");
see also Hutchinson, 536 F.3d at 961 n.6 (refusing to consider
whether "group pleading doctrine" survived the Reform Act).  But
see In re Nash Finch Co. Sec. Litig., 502 F. Supp. 2d 861, 878 (D.
Minn. 2007) ("[T]he group pleading doctrine remains available to
attribute group published documents, such as press releases, to
those individuals with direct involvement in the everyday business
of the company." (quotation omitted)).

plausible or reasonable inferences do not support a strong inference. Id. at 314. Rather, an inference is strong only if a reasonable person would find it "cogent and at least as compelling as any opposing inference of nonfraudulent intent." Id. A court's inquiry is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Id. at 322-23 (emphasis in original); see also In re Ceridian Corp. Sec. Litig., 542 F.3d 240, 244 (8th Cir. 2008); Elam, 544 F.3d at 928.

Scienter "requires a showing of reckless or intentional wrongdoing" that can be established "(1) from facts demonstrating a mental state embracing an intent to deceive, manipulate or defraud, (2) from conduct which rises to the level of severe recklessness, or (3) from allegations of motive and opportunity." Elam, 544 F.3d at 928 (quotations omitted). Factual allegations indicating "that defendants made statements when they knew or had access to information suggesting these public statements to be materially inaccurate" create a strong inference of scienter. Navarre, 299 F.3d at 746. Severe recklessness is shown through "highly unreasonable omissions or misrepresentations involving an extreme departure from the standards of ordinary care, and presenting a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must

62

have been aware of it." K-Tel, 300 F.3d at 893 (quotations omitted). "[T]he facts giving rise to motive and opportunity may also support a reason to believe the defendant's misrepresentation was knowing or reckless." Id. at 894 (quotation omitted). Motive is shown through "concrete and personal benefit to the individual defendants resulting from the fraud." Id. (citation omitted). However, "the absence of a motive allegation is not fatal" to a plaintiff's claim. Tellabs, 551 U.S. at 325.

Alleged GAAP violations alone do not raise an inference of scienter. Ferris, Baker Watts, Inc. v. Ernst & Young, LLP, 395 F.3d 851, 855 (8th Cir. 2005) (citation omitted). "Only where these allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient." Id. (quotation omitted). Similarly, false SOX certifications are probative of scienter only if they are accompanied by "allegations of particular facts demonstrating how the defendants knew of the scheme at the time they made their statements of compliance, that they knew the financial statements overrepresented the company's true earnings, or that they were aware of a GAAP violation and disregarded it." Ceridian, 542 F.3d at 248 (quotation omitted).

In addition to the complaint's litany of alleged external market indicators and the misrepresentations and omissions discussed above, lead plaintiff alleges several "additional facts

giving rise to a strong inference of scienter."[34]  (Compl. ¶¶ 288-436.)  The complaint first asserts that all but two employees in the Investment Department were terminated or resigned.  (Id. ¶ 385.)  These allegations, however, neither identify the timing of the terminations and resignations nor provide additional details connecting the terminations and resignations to the asserted misrepresentations and omissions.  Absent such details, the stronger inference is that the employees were terminated after MoneyGram shifted its Portfolio strategy, thus obviating the need for those employees.

Second, the complaint maintains that the SEC's seizure of documents and ongoing investigation supports a strong inference of scienter.  To the contrary, where, as here, an ongoing SEC investigation does not result in hearings or adverse findings, an inference "that the SEC investigation uncovered no evidence of fraud," is more compelling than an inference of fraud.  Ceridian, 542 F.3d at 248-49.

Third, the complaint alleges that an institutional investor who had invested in MoneyGram's stock before and during the class period met with Milne and Parrin in November 2007 and requested

---

[34] The complaint bases several of its allegations on statements from confidential sources.  (Id. ¶¶ 333-91.)  The information alleged in the complaint related to these sources satisfies the Reform Act's requirements by providing "sufficient documentary evidence and/or a sufficient description of the personal sources of the plaintiff's beliefs."  NVE Corp., 551 F. Supp. 2d at 881.

disclosure of the Portfolio's holdings.  According to the source, Milne and Parrin refused to disclose the holdings because it would be "disruptive" in light of the then current macroeconomic conditions, and that although the securities were "high quality," they would have traded at significant discounts because of the market disruption.  (Compl. ¶¶ 389-91.)  These allegation support an inference that Milne and Parrin knew or should have known that the Portfolio's securities were significantly and permanently impaired by the market decline.  Such an inference is at least as strong as the competing inference that Milne and Parrin did not know, or recklessly disregard, the full extent of the Portfolio's impairment.

Fourth, lead plaintiff argues that an "independent analysis" of the actual securities in the Portfolio during the class period shows that its securities were not of higher quality and different vintages than those that were being downgraded by ratings agencies. To support this allegation, lead plaintiff refers to ratings downgrades and changes in ratings methodology related to subprime RMBS by S&P and Moody's in July 2007.  (Id. ¶ 394.)  The complaint does not provide specifics about the downgraded securities, nor does it identify any of the Portfolio's securities that were directly affected by the downgrades or changes in methodology.  The complaint, however, asserts that the Portfolio contained securities with the same vintages and originators as the downgraded

securities.   Such allegations permit an inference that defendants knew or recklessly disregarded the effect of the ratings agencies' actions on the Portfolio's securities.

Fifth, the complaint asserts that the contents of a December 20, 2007, nonpublic letter to various state regulators acknowledging "turmoil in the credit markets [that] has caused the value of some of our investments to decline," and broadly outlining the negotiations with investors support an inference of scienter. (Id. ¶ 427-30.)  The letter, however, largely reiterates the public disclosures related to the 3Q07 financials and in the December press releases.  Therefore, the alleged "nonpublic" contents of the letter do not support an inference of scienter.

Finally, lead plaintiff argues that the timing of Milne's November 8, 2007, amended employment contract supports an inference of scienter.  The amended contract "reverted back to the effective date of Milne's earlier agreement, and was thus effective from July 1, 2005 to July 1, 2008." (Id. ¶ 432.)  By amending the contract, the complaint alleges that Milne secured three new benefits that would continue after termination of his employment with MoneyGram. Milne, however, did not resign until several months later, and the timing of the amended employment contract does not support an inference of scienter.

In sum, the complaint's factual allegations are subject to two competing narratives.  Both narratives accept that the market for

subprime and Alt-A ABS was in turmoil during the class period and eventually froze. Defendants' narrative, however, maintains that at the beginning of the class period the eventual scope of the market failure was unforeseeable, particularly as it related to the Portfolio's ABS, which were primarily A-rated or higher and largely collateralized by mortgages with vintages thought to be less susceptible to the market downturn. As 2007 progressed and the full extent of the market decline became apparent, defendants maintain that they proactively disclosed additional sufficient details about the Portfolio's content and exposure to correspond with that decline. Specifically, defendants assert that their increased recognition of unrealized losses and OTTI securities accurately tracked the actual market decline, and that the disclosures specific to the Portfolio's subprime and Alt-A ABS beginning in July 2007 were adequate. In short, defendants insist that throughout the class period they valued the Portfolio and made disclosures in good faith as reflected by the absence of insider trading allegations and financial restatements. Therefore, defendants urge that it is improper to impose liability for failing to presage the nation's worst economic meltdown in decades.

On the other hand, lead plaintiff's narrative indicates that by the beginning of the class period external "red flags" reflecting the failure of the subprime and Alt-A markets were so apparent that defendants - whose business was dependent on the

liquidity and success of the Portfolio - knew or should have known that the Portfolio's ABS were substantially impaired.  Indeed, lead plaintiff continues, defendants knew the Portfolio's ABS could not be reliably priced from the beginning of the class period, which resulted in violations of MoneyGram's internal controls and GAAP. As the market continued to fall, defendants selectively and misleadingly released information specific to the Portfolio's subprime and Alt-A exposure.  As a result, investors were led to believe that the market decline had a minimal effect on the Portfolio and did not present a threat to MoneyGram's solvency. Meanwhile, MoneyGram was exploring bankruptcy and comprehensive recapitalization of the company because of the illiquidity of the Portfolio's ABS, MBS and CDO, and rejecting overtures to buy the company to prevent revelation of its financial problems.  In short, lead plaintiff alleges that defendants fully appreciated, or were severely reckless in not appreciating, the extent of the market turmoil's effect on the Portfolio throughout the class period but failed to make adequate and accurate disclosures for fear of the market's reaction and being found in violation of MoneyGram's payment service obligations.

Despite the shortcomings of some of lead plaintiff's additional allegations of scienter, the court determines that, in consideration of the totality of the circumstances, and with particular emphasis on the alleged misrepresentations and

omissions, a reasonable person could find lead plaintiff's fraud narrative to be cogent and as plausible as defendants' opposing nonfraudulent narrative. Therefore, the complaint's factual allegations permit a strong inference of scienter.[35] Cf. In re Moody's Corp. Sec. Litig., 599 F. Supp. 2d 493, 514-16 (S.D.N.Y. 2009) (scienter established through circumstantial evidence); New Century, 588 F. Supp. 2d at 1228 (finding adequate allegations of deliberately reckless misrepresentations about "loan quality, internal controls and various financial statements").

### 4.   Loss Causation

A plaintiff satisfies the loss causation requirement of § 10(b) and Rule 10b-5 by alleging facts that support "'a causal connection between the material misrepresentations and the loss.'" Schaaf v. Residential Funding Corp., 517 F.3d 544, 550 (8th Cir. 2008) (quoting Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 342 (2005)). In other words, "the defendant's fraud - and not other events - [must have] caused the security's drop in price." Id. (citations omitted). A court assesses loss causation under "ordinary pleading rules." Dura, 544 U.S. at 347. Thus, "it should not prove burdensome for a plaintiff who has suffered an

---

[35] Defendants do not challenge the individual defendants' knowledge of the relevant alleged facts. Rather, defendants argue only that such knowledge does not permit a strong inference of scienter. Therefore, the court's scienter analysis applies equally to all defendants. Cf. Elam, 544 F.3d at 929-30 (refusing to reject or adopt the "core operations approach" to pleading scienter).

economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." Id.

Defendants argue that the September 11, 2007, presentation and Form 8-K disclosed the composition of the Portfolio and that the 3Q07 10-Q revealed the truth about the fair value determination method and ratings methodology. Therefore, defendants contend that the complaint does not plead loss causation because no decline in stock price followed those disclosures, and the October 17, 2007, and January 14, 2008, press releases did not correct or restate any earlier disclosures alleged to be false. Defendants, however, misconstrue lead plaintiff's claims, which generally assert that throughout the class period defendants consistently overstated MoneyGram's financial condition by understating the Portfolio's unrealized losses and securities that were OTTI. The October 17 press release, lead plaintiff maintains, partially disclosed the Portfolio's impairments by acknowledging a significant increase in unrealized losses and the concomitant need for additional borrowing. These disclosures led to a $2.58 drop in MoneyGram's share price. Over the next three months, lead plaintiff alleges, defendants continued to conceal the full extent of the Portfolio's financial woes until MoneyGram had agreed to a comprehensive recapitalization of the company, at which time the truth of MoneyGram's financial condition was finally revealed. The market's

response to MoneyGram's disclosures resulted in an immediate 49.5 percent decline in MoneyGram's stock with further declines in the following months.   These allegations of loss causation are sufficient to survive a motion to dismiss for failure to state a claim.  See Dura, 544 U.S. at 344 (defendant "who misrepresents the financial condition of a corporation in order to sell its stock becomes liable to a relying purchaser for the loss the purchaser sustains when the facts become generally known and as a result share value depreciates"); Schaaf, 517 F.3d at 550 ("[T]he plaintiff must show that the loss was foreseeable and that the loss was caused by the materialization of the concealed risk." (quotation omitted)); see also Lormand v. US Unwired, Inc., No. 07-30106, 2009 U.S. App. LEXIS 7452, at *109-12 n.33 (5th Cir. Apr. 9, 2009) (loss causation adequately pleaded by allegations that "the stock dropped after the last disclosure in the series of disclosure events"); In re Williams Sec. Litig. - WCG Subclass, 558 F.3d 1130, 1138 (10th Cir. 2009) ("[T]he truth could be revealed by the actual materialization of the concealed risk rather than by a public disclosure that the risk exists."); In re Countrywide Fin. Corp. Sec. Litig., 588 F. Supp. 2d 1132, 1201 (C.D. Cal. 2008) ("Defendants here attack Plaintiffs' loss causation theories because Countrywide's corrective disclosures were made over an extended period of time and often in combination with alleged further misrepresentations that dampened the disclosures' price

effects.   The point, however, is that the price of Countrywide securities dropped as the disclosures accumulated.").   Therefore, the court determines that the complaint asserts claims under § 10(b) and Rule 10b-5 against all defendants except Putney.

**B.   Section 20(a) Claim**

Section 20(a) of the Exchange Act extends liability for primary violations of § 10(b) to individuals controlling the primary violators.   15 U.S.C. § 78t(a); see also Nash Finch, 502 F. Supp. 2d at 883.   Whether an individual defendant is a controlling person is a fact-intensive inquiry that involves "scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." In re Xcel Energy, Inc. Sec., Derivative & ERISA Litig., 286 F. Supp. 2d 1047, 1060 (D. Minn. 2003) (quotation omitted).

Defendants do not challenge the complaint's allegations of the controlling persons status of the individual defendants.   Rather, defendants argue that lead plaintiff's § 20(a) claims should be dismissed because the complaint does not allege a primary violation.   As discussed above, however, the complaint adequately asserts a primary violation of § 10(b).   Therefore, the court denies defendants' motion to dismiss this claim.

**CONCLUSION**

Based on the above, **IT IS HEREBY ORDERED** that:

1.    Defendants' motion to dismiss [Doc. No. 74] is granted in part and denied in part;

2.    Defendants' motion to dismiss the § 10(b) claim against defendant Putney is granted without prejudice; and

3.    Defendants' motion is denied as to the remaining claims.

Dated:   May 20, 2009

                                        s/David S. Doty
                                        David S. Doty, Judge
                                        United States District Court