## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

|  |  |  |
|---|---|---|
| In re MoneyGram International, Inc. Securities Litigation | ) ) ) ) ) ) ) ) ) ) | Consolidated Case No.: Civ. No. 08-883 (DSD/JJG) |

## LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL PLAINTIFF TO DISCLOSE THE IDENTITY OF THEIR CONFIDENTIAL SOURCES

# I.
## INTRODUCTION

Defendants' Motion to Compel (Docket No. 119) is nothing more than an effort by a company under SEC investigation—and the six insurance companies paying to defend it—to keep independent whistleblowers from coming forward to expose corporate fraud, corruption, and malfeasance.  OTRS provided Defendants with the names and job descriptions of every person referred to as a "confidential source" in OTRS' Complaint. OTRS provided Defendants with an eleven page, single-spaced, summary of the factual allegations set forth in the Complaint attributable to each such person.  The only thing OTRS has not done, and the thing that Defendants desperately seek, is to expose each of these persons by labeling them—not as persons who may have knowledge of relevant facts—but, instead, as "confidential sources."  Defendants have no legitimate reason or need to label (and thus expose) these persons as "confidential sources."

Defendants (and their insurers) *want* this information for an improper purpose:  to expose these people so they can harass, embarrass, and intimidate them, thereby creating an environment in which people who know about fraud committed by their employers and colleagues will keep quiet.  There can be no other purpose.  Indeed, Defendants already told the Court that OTRS' confidential sources possess no information whatsoever that is probative of securities fraud.  More specifically, Defendants derisively claimed that:

> [W]hen the reader finally arrives at the anticipated confidential witness section, the Complaint offers **only innocuous and irrelevant statements** and amazingly concludes a fraud occurred "as more fully described above."

Defs' Motion to Dismiss at 2 (Docket No. 78) (emphasis added).

Similarly, contrary to Defendants' current position that OTRS' Complaint relies "almost exclusively on the confidential witnesses in the Complaint to allege securities fraud," (Defs.' Motion at 2), Defendants said just the opposite in their Motion to Dismiss:

> The first thirty pages [of the Complaint] present noting more than a conclusory argument that would be seen in a brief. The next 230 pages merely regurgitate MoneyGram's SEC filings and irrelevant news articles, followed by a looping set of verbatim conclusions repeated throughout the Complaint. The remainder of the Complaint reverts to conclusory, fraud-by-hindsight allegations that MoneyGram's public disclosures, while accurate, should have been made earlier.

*Id*. at 2. In other words, Defendants' position on this matter is constantly shifting to suit their current agenda.

To summarize, Defendants previously told the Court that: (1) OTRS did not rely heavily upon confidential sources in the Complaint, and (2) that any information attributed to those sources was <u>irrelevant</u> **and** <u>innocuous</u>. Surely Defendants meant what they said and said what they meant. After all, they filed their Motion to Dismiss pursuant to Rule 11. If, as Defendants so boldly told the Court, these "confidential sources" possess and provided nothing more than innocuous and irrelevant information, and the Complaint largely relied upon publicly available information, then information provided by these persons is arguably not even discoverable. And, once their names are provided

as persons with knowledge, as they were here, Defendants could never have a legitimate basis to further label and expose these persons as confidential sources.[1]

Defendants' prior statements in this regard are, alone, reason enough to summarily deny Defendants' Motion.

The fact is that Defendants know confidential sources can serve a vital role in helping ferret out corruption and fraud—just as they do in many areas outside of the securities litigation arena.[2]   And, they know that if they are able to obtain a series of judicial decisions pronouncing that anyone who provides information on a confidential basis believing they will not be exposed as "sources," but are later exposed—and quite possibly harassed—for providing such information, then such persons are unlikely to come forward in this and future cases.   Being able to pierce attorney work product is icing on the cake.

---

[1]Equally disingenuous is Defendants' effort to imply that these sources played a significant role in the Court's decision to deny Defendants' Motion to Dismiss.   The Court's Order Denying Defendants' Motion to Dismiss is 73 pages.   Docket No. No. 89.   In that 73 page Order, the Court rarely referred to information provided by a person referred to as a "confidential source".   *Id.*   The Court did not rely exclusively upon information attributed to any source in reaching its decision, nor did it find that the information attributed to any source, standing alone, was sufficient to plead securities fraud. *Id.*

[2] For example, without confidential sources, the public would never have found out about Watergate (Woodward and Bernstein protected the identity of "Deep Throat for thirty year.   They did not reveal that he was Mark Felt, the former Number 2 ranking person in the Federal Bureau of Investigation, until after his death.   Similarly, without Cynthia Cooper, a former Vice President at WorldCom, the Company's $4 billion fraud may never have become known to the public; and, without Sharon Watkins, a former Vice President at Enron, that Company's fraud may have continued for years, further destroying the life savings of thousands of employees and investors.   Cooper and Watkins were able to work, confidentially, while they were trying to ferret out corruption..

Defendants' Motion to Compel must be denied.   The Supreme Court has recognized that private securities fraud actions play a vital role in supplementing the work of the Securities and Exchange Commission and Department of Justice.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).  Many private litigants need to rely upon confidential sources to ferret out and expose corporate fraud.  If honest workers cannot come forward to expose corporate fraud without fear of harassment, intimidation and retaliation, they will simply refuse to come forward.   Then, the important role that private litigation plays in keeping our markets open and honest will be thwarted.  That is clearly what Defendants and their insurers want.  But, that is not what Congress, the courts, or public policy should allow.

## II.
## SUMMARY OF THE ARGUMENT

OTRS has provided Defendants with a comprehensive list of persons with knowledge of relevant facts.   OTRS is not required to further label and expose the persons within that list as "confidential sources."   To reveal this information would invade Counsel's trial preparation materials and reveal their strategy, evaluation, and investigation.  *See Hickman v. Taylor*, 329 U.S. 495 (1947), *codified in* FED. R. CIV. P. 26(b)(3).   A ruling exposing confidential sources would also thwart Counsel's trial preparation because Counsel would not be able to talk to any witness or relevant person on a confidential basis as they try to prepare for trial.  Such a ruling would also violate public policy by, among other things, creating a chilling effect on the willingness of non-parties to come forward with information that may expose corporate corruption or fraud.

The most recent and controlling authority on this issue is *In re St. Paul Travelers Sec. Litig. II,* 2007 WL 1424673 (D.Minn. May 10, 2007). authority Defendants desperately seek to avoid.   Under *In re St. Paul*, the information Defendants seek is protected work product.  To pierce the work product privilege, Defendants must establish both that they (1) have a substantial need for the privileged information and (2) will suffer undue hardship if they have to obtain it by other means.  *See Hickman v. Taylor*, 329 U.S. 495 (1947), *codified in* FED. R. CIV. P. 26(b)(3).

As the following factual discussion makes clear, Defendants cannot establish either of these mandatory prongs.  OTRS already has provided the names and relevant information regarding each person who is referred to as a source.  The only thing OTRS has not done is to label these persons as also being "confidential sources."  Defendants have failed, and cannot, establish any legitimate need for that information.  Further, Defendants will not suffer any hardship, much less an undue one, if OTRS does not label these persons as "confidential sources."  As demonstrated below, OTRS has provided Defendants with more than enough information to narrow the field of persons with relevant knowledge who may also have been referred to as confidential sources.  All Defendants must do is actually examine the discovery OTRS provided, and undertake a *de minimus* investigation of information they possess to the exclusion of OTRS.  Because that is what Defendants should do in the normal course of this litigation, it can hardly be said that such is an undue hardship.

Finally, like most of the cases Defendants cite, Defendants' primary authority, *In Re Connetics Securities Litigation*. is wholly inapplicable to the facts at issue in this case.

6

As a threshold matter, the *Connetics* court recognized it faced a split of authority on this issue.  There is no such split in this District.  Second, the *Connetics* court found (albeit incorrectly) that it may impose a substantial hardship upon the defendants to have to depose nearly 80 witnesses.  In the present case, OTRS has narrowed the universe of potential witnesses whom Defendants may have to depose to a small handful.  Third, the *Connetics* court found that public policy concerns regarding witness harassment and intimidation were not present because Connetics had been out of business for three years.  Here, MoneyGram is still active and prominent in Minnesota.  Finally, the *Connetics* court reasoned that its opinion would have been different if counsel had stated that they did not intend to rely upon any of the witnesses at issue at trial.  Here, as discussed below, OTRS has amended its Initial Disclosures to include only those persons it presently intends to rely upon to support its claims and no person referred to as a confidential source is included on that list.

Accordingly, Defendants' Motion to Compel is legally and factually devoid of merit and should be denied.

### III.
### CORRECTION OF DEFENDANTS' FACTUAL MISREPRESENTATION

Prior to addressing the legal arguments advanced in Defendants' Motion, Defendants' factual misrepresentations must be identified and corrected.  Defendants portray OTRS as a serial obstructionist who hides relevant non-privileged needles in a haystack of less important information, while portraying themselves as hopelessly lost in their search for such information.  The following excerpts illustrate this point:

> [OTRS] has demonstrated a repeated practice of basing class action securities fraud complaint allegations on statements from purported "confidential sources," and then burying their names among hundreds listed in initial disclosures and interrogatory responses in order to mask their identities.
>
> OTRS listed more than 100 entities and individuals in its initial disclosures and interrogatory responses, but instead of providing any meaningful description of what information each may possess, it offered nothing more than a copy and paste summary.

*See* Defs.' Motion to Compel (hereinafter "Motion") at 1 & 2.

First, to be perfectly clear, OTRS' objections in *Connetics* were appropriately based on authority from that District. Indeed, the court recognized that there was "no Ninth Circuit or Supreme Court precedent" on the issue, and that "[d]istrict courts have reached different conclusions on this issue." *In re Connetics Corp. Sec. Litig.*, 2009 WL 1126508, *1 (N.D. Cal. April 27, 2009). Second, the *Connetics* court did not find that OTRS was a discovery abuser. To the contrary, just two weeks after the *Connetics* opinion, on May 12, 2009, the court certified the case, found OTRS to be an adequate class representative, and certified OTRS to serve as class representative. *See* Beckworth Decl., Exh. G.

In addition to the foregoing, and to ensure that the record is clear—and accurate— OTRS sets forth the actual facts underlying the parties' discovery dispute. In response to Defendants' request for the identity of "each confidentially source referred to in the Complaint," OTRS properly objected consistent with controlling authority in this District and informed Defendants that each confidential source in the Complaint was contained in the list of persons with knowledge of relevant facts provided in response to Interrogatory

No. 1 and through OTRS' initial disclosures.  *Id*. at Puls Aff, Ex. A (Docket No. 122-1).

Through its Initial Disclosures and response to Defendants' Interrogatory No. 1, OTRS

identified 123 persons/entities (at most)[3] with knowledge of relevant facts.  *Id*. at Puls

Aff, Ex. A & B (Dkt 122-1 & 122-2).  Defendants conclude their factual analysis at this

point and proclaim OTRS "provided no information from which MoneyGram can

determine who the confidential witnesses are among a list of more than 100 names."  *Id.*

at 3.  This is simply incorrect.

Indeed, Defendants ignore that OTRS provided significant detail regarding each

confidential source in response to Interrogatory Nos. 1, 3 and 4, through its Initial

Disclosures, and through the Complaint that allows Defendants to determine the identity

of each confidential source—if that was, in fact, their motivation.  *Id*. at Puls Aff., Ex. A

& B (Docket No. 122-1 & 122-2).

Based on the information provided, <u>no</u> confidential source is identified as:  (1) the

plaintiff, (2) corporate defendant, (3) officer defendant, (4) director defendant, (5)

auditor, (6) analyst, (7) rating agency, (8) officer, director or employee of Euronet, (9)

officer, director or employee of SS&C, (10) officer, director or employee of JPMorgan

Chase, (11) any entity involved in Stillwater CDO, (12) Long Lake Partners, (13) Cairn,

(14) an investment bank that provided securities to and/or traded such securities with

MoneyGram, or (15) Thomas H. Lee Partners.  *Id*.

---

[3]The number is actually less than 123 as several third-party individuals identified work
for the same entity.  However, OTRS is using the higher number to give Defendants'
argument the benefit of the doubt.

As such, it would have taken Defendants mere minutes to reduce the universe of potential confidential sources from 123 to 72. *See, e.g.*, *id*. at Puls Aff., Ex. A (Docket No. 122-1) (identifying 51 persons/entities within the above-categories). Thus, contrary to Defendants' false claim that OTRS "provided no information from which MoneyGram can determine who the confidential witnesses are among a list of more than 100 names," the information provided allowed Defendants to whittle the list to 72 with the slightest of effort had they chosen to do so.

The remaining list of 72 is comprised of 69 current and former employees of MoneyGram and three fund managers. *Id*. As set forth in Section V, *infra*, even if Defendants had established a substantial need for the information they seek (which they did not), determining the identity of six confidential sources from a list of 72 persons with knowledge of relevant facts consistently has been found <u>not</u> to impose undue hardship on the receiving party. But, OTRS provided Defendants with much more information to narrow the field.

OTRS provided additional substantive information regarding each person who is referred to as a confidential source's job, title, employment dates, supervisors/direct reports, co-workers, and or department that reduces Defendants' "burden" to nothing more than what they should already be doing in defense of this action. In the chart below, OTRS sets forth the job, title and/or department of each confidential source as identified in the live Complaint, as well as the identity of the individuals from the list of 72 that could possibly meet each description:

| Confidential Source | Job, Title and/or Department | Potential Person(s) |
|---|---|---|
| CS1 | CS1 began working with MoneyGram in the first quarter of 2007 and **supervised a group of four Systems Accounting Department employees**: Jodi Dawson, Kelly Lloyd, Nancy Jones, and Jacque Mattheisen. CS1 normally reported to Assistant Controller Becky Lobsinger; however, reported to Accounting Manager Sarah Pflaghaar April 2007 to June 2007. CS4, CS1, and the Systems Accounting Manager managed the administration of all Accounting systems MoneyGram utilized for public financial reporting. [Compl. at ¶¶ (hereinafter "¶¶") 351; 353; 355; 358; 363-4]. | Kathy Gjerde Warren Lochner Tony Martin Cathy Parsons Sarah Pflaghaar Kathy Rollins |
| CS2 | CS2 worked at MoneyGram as an **Analyst in the Investment Department** from 2006 until 2008. CS2 reported to Investment Department Portfolio Manager, Josh Greenwald. CS2 was one of ten personnel who worked in MoneyGram's Investment Department. CS2 analyzed credit risk for all of the residential mortgage-backed securities ("RMBS") and commercial mortgage-backed securities ("CMBS") in MoneyGram's Investment Portfolio. CS2 created reports relating to the investments/funds for which CS2 was responsible for evaluating. CS2 created separate reports for various grades of investments. CS2 also was in charge of tracking a fund that MoneyGram itself actually managed, the Stillwater ABS CDO. [¶¶336; 339-49]. | Peter Agrimson Khaysy Bayphrachanh Melissa Hoffbeck |
| CS3 | CS3 was a **senior management level employee in the Investment Department** during the Class Period. CS3 confirmed that Portfolio Manager Josh Greenwald reported directly to Defendant Putney during the Class Period. [¶¶ 337; 386]. | David Albright Josh Greenwald Brent Lingen |
| CS4 | CS4 began working for MoneyGram as an accountant in the Systems Accounting Department in the late 1980s when MoneyGram | Jodi Dawson Nancy Jones Tony Martin |

| | | |
|---|---|---|
| | was still Viad Corporation, and worked at MoneyGram through late 2007. In the early 2000's, CS4 assumed the position of **Systems Accountant Supervisor** and reported to Systems Accounting Manager Sarah Pflaghaar. The Systems Accounting Manager reported to Assistant Controller Becky Lobsinger. CS4, CS1, and the Systems Accounting Manager managed the administration of all Accounting systems MoneyGram utilized for public financial reporting. Through the old spreadsheet-based method, Reger compiled journal entries and, with the approval of Pflaghaar, Reger would submit these spreadsheets to CS4 on a monthly basis, so that CS4 could "post" the entries onto the GL. CS4 was responsible for ensuring that these Management P&L/Balance Sheet Reports were timely and accurately generated for the meetings. CS4 was ultimately responsible for entering any and all adjustments that had been made into the GL. [¶¶ 338; 354-382]. | Jacque Matheissen Cathy Parsons Jackie Reger Kathy Rollins |
| CS5 | CS5 worked for MoneyGram as an **executive for Information Technology and Strategic Planning**, and in 2004, reported to Pam DeGrote, Director of the Information Technology Project Management Office.  CS5 was promoted prior to the Class Period and began reporting directly to Chief Information Officer, Dave Albright. CS5 assisted the Company in preparing and submitting data to the Accounting Department that would eventually be translated into public financial reports. On a weekly basis, CS5 participated in meetings with Defendant Milne and others to discuss various IT strategies, projects and results. [¶¶ 339; 374]. | Pam DeGrote Troy DeLuca Cathy Parsons Diane Prentis |
| CS6 | CS6 is a **fund manager for an institutional investor** that invested money in MoneyGram's common stock before and during the Class Period. In March 2007 and November 2007, CS6 attended a MoneyGram meeting with analysts. [¶ 390]. | Mairs and Power Growth Fund Shapiro Capital Management LLC |

| | | Blum Capital Partners LP |
|---|---|---|

Based on the above chart, which OTRS' counsel created in less than one hour, the universe Defendants claim contains "more than 100 names," shrinks even further to no more than 27 individuals/entities. Again, however, OTRS provided more information.

Based on the information provided by OTRS, Defendants know that CS1 is: (1) one of six MoneyGram employees who supervised employees in the Systems Accounting Department; (2) who also supervised precisely four employees (all identified by name); (3) who also is one of three employees managing the administration of all Accounting systems MoneyGram utilized for public financial reporting; (4) who also normally reported to Assistant Controller Becky Lobsinger, but reported to Accounting Manager Sarah Pflaghaar from April 2007 to June 2007; and (5) who also began employment with MoneyGram in the first quarter of 2007.

Based on the information provided by OTRS, Defendants know that CS2: (1) is one of three MoneyGram employees who worked as an Analyst in MoneyGram's Investment Department; (2) who also worked in that capacity from 2006 until 2008; (3) who also reported to Investment Department Portfolio Manager, Josh Greenwald; (4) who also analyzed credit risk for all of the RMBS and CMBS in MoneyGram's Investment Portfolio; (5) who also created reports relating to the investments/funds for which he was responsible for evaluating and separate reports for various grades of investments; and (6) who also was in charge of tracking MoneyGram's Stillwater ABS CDO.

Based on the information provided by OTRS, Defendants know that CS3 is one of three MoneyGram employees who was a senior management level employee in the Investment Department during the Class Period.

Based on the information provided by OTRS, Defendants know that CS4 is:  (1) one of seven MoneyGram employees who were System Accountants or Supervisors; (2) who also began working for MoneyGram as an accountant in the Systems Accounting Department in the late 1980's when MoneyGram was still Viad Corporation; (3) who also assumed the position of System Accountant Supervisor in the early 2000s; (4) who also ceased working for MoneyGram in late 2007; (5) who also managed the administration of all Accounting systems MoneyGram utilized for public financial reporting; (6) who also was required to post entries onto the general ledger; (7) who also was responsible for ensuring that Management P&L/Balance Sheet Reports were timely and accurately generated; and (8) who also was ultimately responsible for entering any and all adjustments that had been made into the general ledger.

Based on the information provided by OTRS, Defendants know that CS5:  (1) is one of four MoneyGram employees who was an executive for Information Technology and Strategic Planning; (2) who also reported to Pam DeGrote, Director of the Information Technology Project Management Office, in 2004; (3) who also was promoted prior to the Class Period and began reporting directly to Chief Information Officer, Dave Albright; (4) who also assisted MoneyGram in preparing and submitting data to the Accounting Department that would eventually be translated into public

financial reports; and (5) who also participated in weekly meetings with Defendant Milne and others to discuss various IT strategies, projects and results.

And, based on the information provided by OTRS, Defendants know that CS6 is: (1) one of three fund managers for an institutional investor that invested money in MoneyGram's common stock; and (2) who also attended a MoneyGram meeting with analysts in November 2007.

When Defendants first received this information from OTRS, Defendants already were in possession of each of its employee's employment file, as well as the list of attendees at its November 2007 analyst meeting. Based on its possession of this basic information, coupled with the substantial information provided by OTRS, it is beyond doubt that Defendants can dramatically narrow the field of persons referred to as OTRS' confidential sources if it expended minimal effort. Accordingly, Defendants' assertion that it must helplessly search for six needles in haystack after haystack is a gross misrepresentation of the facts underlying the parties' dispute.

Indeed, that Defendants so grossly misrepresent the information provided by OTRS thus far raises the question why Defendants are adamant that Plaintiff provide the name of its confidential sources in response to a discovery request. Defendants have failed to provide a legitimate reason, which leaves only the possibility that Defendants seek this information for an improper purpose. And, that is precisely why requests such as Defendants' threaten longstanding protections afforded confidential sources.

Thus, contrary to Defendants' pejorative comments, OTRS it is not a discovery abuser. Far from it, OTRS is the prototypical institutional investor that Congress

envisioned when it passed the Private Securities Litigation Reform Act of 1995. *See, e.g.*, 15 U.S.C. § 78u-4(a)(3)(B)(ii) & (iii)(I).[4]   It is a multi-billion dollar retirement system that exists for educators.   It serves the employees of more than 600 local school districts, career technology schools, public colleges and universities who are enrolled as members.   As of June 30, 2005, it had 138,245 members (84,286 active contributing, 13,080 inactive and 40,879 retired members).   OTRS mission statement concisely sums up who and what it is:

> The mission of TRS is to provide retirement benefits to Oklahoma's educators. The Board of Trustees and TRS staff oversee its administration *to ensure adequate funds are maintained to meet the financial obligations of the entire membership*. In directing the investments of TRS funds, the Board seeks to maximize gains, minimize losses and protect the Trust. The staff stands ready to assist TRS members in any matter pertaining to accruing benefits, and planning for and enjoying a well-earned retirement.

Consistent with that mission, when a corrupt corporation commits fraud that causes OTRS to lose over $20 million on its investments, as occurred here, OTRS may exercise its right to try to recover what was taken from it.

---

[4]Congress passed the PSLRA in response to criticisms from corporate America that small investors were not sophisticated enough to lead securities fraud cases.   Corporate America got exactly what it wanted when Congress passed a statutory preference that institutional investors and public pension funds—like OTRS—serve as lead plaintiffs when at all possible. *See, e.g.*, 15 U.S.C. § 78u-4(a)(3)(B)(ii) & (iii)(I).   But, corporate America soon found out that what it wanted was not really what it should have asked for because, as virtually every post-PSLRA study has demonstrated, when institutional investors serve as lead plaintiffs, they litigate harder, longer and with more sophistication than most plaintiffs.   As such, the defendants they sue end up paying more money to resolve their claims.   Laura E. Simmons & Ellen M. Ryan, *Post-Reform Act Securities Settlements, 2005 Review and Analysis* (Cornerstone Research 2005), http://securities.stanford.edu/Settlements/REVIEW_19952005/Settlements_Through_12_2005.pdf.   So, Defendants have had to find new attacks to levy on securities fraud plaintiffs, like they have done here against OTRS.

## IV.
## CORRECTION OF DEFENDANTS' FACTUAL MISREPRESENTATIONS REGARDING THE PARTIES' MEET AND CONFER AND OTRS' AND LEAD COUNSEL'S EFFORTS TO RESOLVE THESE ISSUES

Defendants further misstate the facts and circumstances surrounding the parties' meet and confer sessions, and Lead Counsel's efforts to resolve those issues. Far from being a factual record of what has transpired, Mr. Puls' Declaration is largely a misleading argument. Below is a recitation of what actually occurred.

Lead Plaintiff and Defendants served their Initial Disclosures on July 10, 2009. Defendants did not disclose much: themselves, three auditors, one strategic advisor and nothing else. *See* Declaration of Brad Beckworth ("Beckworth Decl."), Exh. A (Defds' Initial Disclosures).[5]   On the opposite end of the spectrum is Lead Plaintiff's Initial Disclosures, wherein OTRS listed the persons and entities reasonably believed to have knowledge of discoverable facts. The list included over 100 persons—many of whom (1) were named in the Complaint (2) are (or were) Defendants own employees, but (3) whom Defendants refused to include in their Initial Disclosures. *See* Defs' Motion at Puls Aff, Ex. A (Docket No. 122-1). The list was comprehensive because OTRS investigation and Complaint were comprehensive.

Lead Counsel wrote Defendants on July 17, 2009, requesting they supplement their Initial Disclosures or affirm that they did not believe there were any other persons who would support Defendants' claims or defenses.  *See* Beckworth Decl., Exh. B.

---

[5]Defendants supplemented their Initial Disclosures on July 30, 2009 to add four (4) non-defendant employees, all of whom were listed in OTRS' Complaint and Initial Disclosures.

Defendants responded that they did not have to identify any other persons because Defendants do not "bear the burden of proof in this matter." *Id.*, Exh. C. (Puls' July 20, 2009 Letter). Defendants also complained that OTRS did not provide enough information about each person listed in OTRS' Initial Disclosures. *Id.*

Lead Counsel informed Defendants that their "bear no burden of proof in this matter" argument was improper, given that Defendants' Answer contained no less than fourteen (14) affirmative defenses—on each of which they bear the burden of proof. *Id.*, Exh. D. (Letter from Brad Beckworth, dated July 27, 2009) In response to Defendants' complaint about OTRS' Initial Disclosures, Lead Counsel informed Defendants that it was difficult for OTRS to identify the <u>specific</u> facts "known" to each individual (many of whom are the Defendants themselves and third parties) because OTRS had not had an opportunity to obtain information from any of those persons under oath and, at the time of filing the Initial Disclosures, had not received any documents from Defendants. *Id.* As such, Lead Counsel informed Defendants that OTRS had offered a general description of the types of information each person may know about and would supplement its Initial Disclosures after it had an opportunity to receive and review the documents Defendants had in its possession—that is, after it had an opportunity to determine what these people <u>actually</u> "know." *Id.*

Defendants responded on July 30, 2009, by stating that Rule 26(a) does not require <u>either of the parties</u> to list individuals that have knowledge that supports their claims. *Id.*, Exh. E. Defendants instead informed Lead Counsel that it is Defendants' position that the parties only have to disclose those persons they *intend* to use to support their claims

or defenses and, as such, OTRS should amend its Initial Disclosures to include only those persons whom OTRS "intends to use at this point to support its claims . . . ." *Id.*

Defense Counsel and Lead Counsel then had a meet and confer telephone conference on these issues (and others) on August 13, 2009. Contrary to Mr. Puls' misleading argument, Lead Counsel did not "outright" refuse to identify its confidential sources or describe what they may know. Nor did Lead Counsel refuse to provide a legal basis for not exposing the persons also referred to as "confidential sources." Instead, Lead Counsel informed Defendants of the following:

1.  Any person referred to as a "confidential source" was listed as a person with knowledge in the Initial Disclosures as well as in OTRS' Response to Interrogatory No. 1;

2.  The information attributed to each person referred to as a "confidential source" was set forth in an 11 page single-spaced answer in OTRS' Response to Interrogatory No. 4;

3.  It was not possible to copy the same answer from OTRS' Response to Interrogatory No. 4 (detailed summary of facts attributed to each "confidential source") and place it beside each person's name(s) in the Initial Disclosures and OTRS' Response to Interrogatory No. 1 because, to do so, would expose these persons as persons who were also referred to as "confidential sources;"

4.  OTRS legal basis for responding in this fashion and in not exposing these persons as "confidential sources" is Federal Rule of Civil Procedure 26(b), federal case law interpreting the attorney work product privilege, and public policy;

5.  The reason OTRS provided a comprehensive list of persons in their Initial Disclosures was that Lead Counsel wanted to ensure that Defendants had the full list of persons reasonably believed to have knowledge of discoverable facts to be fully forthcoming in the discovery process (it is important to note that this list was provided nearly a month prior to responding to Interrogatory No. 1, which demonstrates how forthcoming

OTRS was trying to be and also explains why Interrogatory No. 1 mirrors the Initial Disclosures); and

6.      After Lead Counsel had an opportunity to review the documents that Defendants had, as of that date, not provided, Lead Counsel would review the Initial Disclosures and Response to Interrogatory Number 1 to: (a) determine whether some of the listed persons actually did not have such knowledge; (b) more fully describe what the remaining persons know based upon the documents authored or reviewed by them; and (c) continue to narrow and supplement these responses as discovery continues.

Beckworth Decl. at ¶¶ 9-14.

Thus, OTRS' and Lead Counsel's efforts to work through these issues have been amicable, extensive and justified.  The sweeping, dramatic, and pejorative statements made by Defendants are just the opposite.  Moreover Defendants' statement that OTRS and Lead Counsel have refused to follow through on any agreement to supplement these responses in the due course of discovery is wrong.

Lead Counsel just received Defendants' first document production on September 8, 2009—two days prior to Defendants' letter and two weeks before Defendants filed their Motion—and have been in the process of implementing those documents into Lead Counsel's document management system.  *Id*. at ¶ 15.  Therefore, Lead Counsel's review of these documents has only just begun.  Further, to date no depositions have been taken. As Lead Counsel has an opportunity to review these documents and conduct depositions, OTRS will supplement if and as necessary.

Accordingly, Defendants jumped the gun with the present motion.  And, it is clear why they did that:  OTRS filed its Motion to Compel against Defendants on September 8, 2009.  Defendants served its letter threatening a motion to compel against OTRS on

September 10, 2009.  The self-serving reason for the timing of Defendants' letter and motion—which Defendants then strategically set to be heard on the same date as OTRS' Motion—is self-evident.

Nevertheless, OTRS has decided to follow Defendants' lead and list in its Initial Disclosures only those persons whom OTRS <u>intends</u> to use <u>at this point</u> to support its claims.  *See* Beckworth Decl. Exh. D.  Because Lead Counsel has only recently received Defendants' initial document production, has numerous discovery requests outstanding to Defendants and over a dozen third parties, and has not yet had an opportunity to depose any witnesses, OTRS and Lead Counsel can only affirmatively list a few persons who it presently <u>intends</u> to use to support its claims.

Accordingly, concurrent with the filing of this Motion, OTRS has amended its Initial Disclosures to include only the names of those persons it currently *intends* to use to support its claims.  *See* Beckworth Decl., Exh. F. No person referred to as a "confidential source" in the Complaint is included on this list or a person OTRS presently intends to use to support its claims. Thus, Defendants have no need to expose the person's listed in response to Interrogatory Number 1 as persons referred to as "confidential sources" in Interrogatory Numbers 3-4 other than to harass, intimidate and embarrass them.  And, more importantly, unless and until OTRS intends to rely upon any such person to support OTRS' claim, they are not required to expose them as confidential sources under this District's precedent in *In re St. Paul Travelers Sec. Litig. II*, No. 04-4697, 2007 WL 1424673, at *1 (D. Minn. May 10, 2007).

# V.
# ARGUMENT

## A.    Plaintiffs' Confidential Witnesses Are Protected Work Product

The work product doctrine protects trial preparation materials that reveal an attorney's strategy, evaluation, and investigation. *See Hickman v. Taylor*, 329 U.S. 495 (1947), *codified in* FED. R. CIV. P. 26(b)(3).   Although the identity and location of witnesses *with knowledge* of discoverable matters is not protected, the identity of witnesses *actually interviewed* by opposing counsel *is* protected.   *See Laxalt v. McClatchy*, 116 F.R.D. 438, 443 (D. Nev. 1987); *Mass. v. First Nat'l Supermarkets, Inc.*, 112 F.R.D 149, 154 (D. Mass 1986).

Consequently, numerous courts, including courts in this District, have held that the identity of confidential sources in securities fraud litigation is protected from disclosure as work product. *See, e.g., In re St. Paul Travelers Sec. Litig. II,* 2007 WL 1424673 (D.Minn. May 10, 2007);[6] *In re MTI Tech. Corp. Sec. Litig. II*, No. 00-0745, 2002 U.S. LEXIS 13015, at *4 (C.D. Cal. June 13, 2002) (denying defendants' motion to compel and holding that the names of confidential witnesses are work product); *In re Ashworth, Inc. Sec. Litig.*, 213 F.R.D. 385, 389-90 (S.D. Cal. 2002) (relying on reasoning from *MTI* and serious issues raised about the "chilling effect" on confidential informants, which led court to deny defendants' motion to compel identification of the 100 witnesses originally produced as confidential sources); *In re Elec. Data Sys. v. Steingraber*, No. 02-225, 2003

---

[6]Defendants acknowledge the holding of *In re St. Paul*, and then unpersuasively attempt to argue that this Court should not follow this authority. *See* Defs' Motion at 11, n.5. Defendants' ineffective attempt will be addressed below.

WL 21653405, at *2 (E.D. Tex. July 9, 2003)(holding that revealing the identity of witnesses interviewed "would permit opposing counsel to infer which witnesses counsel considers important, thus revealing mental impressions and trial strategy"); *In re Vecco Instruments Inc. Sec. Litig.*, 2007 WL 274800, at *1 (S.D.N.Y. Jan. 29, 2007).

The underlying premise woven through the fabric of these decisions is that requiring the plaintiff to label witnesses as persons who also are confidential sources unfairly reveals the attorney's mental impressions and trial strategy. As the *MTI* Court clearly stated:

> This is not a mere list of interviewees, but the identification of individuals that are linked to very specific factual contentions in the [complaint]. Disclosure of their identity would necessarily reveal counsel's opinions regarding the relative importance of these witnesses, the highlights of their testimony/factual knowledge, and would link any future factual statements by the witnesses with Plaintiffs' counsel's legal theories and conclusions as outlined in the complaint.

*MTI*, 2002 U.S. LEXIS 13015, at *12-13.

Despite Defendants' claim that the "weight of federal authority" is to the contrary (a claim that necessarily requires a comparison), Defendants take only a passing glance at *In re St. Pau*l and completely ignore all other authority contrary to Defendants' position. Defendants' statement is incorrect and ignores authority from this District that is directly on point.

In *St. Paul*, the District Court affirmed the Magistrate Judge's order denying the defendants' motion to compel, holding that the determination that "the identities of plaintiff's confidential witnesses "are protected attorney work product <u>is not</u> contrary to law." <u>*In re St. Paul,*</u> 2007 WL 1424673, at *6. The Court's holding is the most recent,

and controlling, authority on this issue.   OTRS fairly relied on this holding when objecting to Defendants' attempts to discover that precise information.   As such, OTRS' properly complied with the controlling law on this issue.

In their zeal to harass and intimidate these confidential sources, Defendants brazenly try to sweep this controlling precedent under the rug by falsely claiming the District Court "did not decide the issue" and boldly proclaim that *St. Paul* "support's MoneyGram's position."   Defs.' Motion at 11, n.5.   Both of these statements are meritless.

The magistrate judge held the attorney work product privilege prohibited the defendants from forcing the plaintiff to label persons with knowledge as also being "confidential witnesses."   *In re St. Paul*, No. 04-4697, Dkt. 117 (D. Minn. Mar. 28, 2007).   When the District Court reviewed this conclusion, it affirmed the magistrate judge's order—"conclud[ing]" that it was "<u>not</u>" contrary to law.   *In re St. Paul*, U.S. Dist. LEXIS 34527 at *6.   Thus, contrary to Defendants' argument:  (1) this issue already has been decided in this District; (2) *In re St. Paul* is controlling; (3) OTRS' objection to disclosure of this information pursuant to the attorney work product privilege was entirely proper; and (4) the identity of the "confidential sources" in the Complaint are protected from disclosure by the attorney work product privilege.

As such, Defendants bear the burden of proving the attorney work product privilege should be disregarded.  To meet that burden, Defendants must establish that: (1) they have a *substantial need* for this information; **and** (2) they cannot obtain the information, or its equivalent, without *undue hardship*.   FED. R. CIV. P. 26(b)(3);

24

*Hickman*, 329 U.S. at 511.  Defendants cannot meet either prong of this test.

###   1.   *Defendants Have Not Established A Substantial Need To Expose The Identity Of OTRS' Confidential Sources*

As a threshold matter, as Defendants concede, the prevailing law in this District is that a plaintiff is not required to expose the identity of any person referred to as confidential source if the plaintiff does not intend to rely upon that person at trial.  Defs.' Motion at 11 (citing *In re St. Paul Travelers Sec. Litig.* II, No. 04-4697, 2007 WL 1424673, at *1).  As discussed above, Defendants' requested that OTRS supplement its Initial Disclosures to include only those persons whom OTRS intends to use to support its claims or defenses.  OTRS has done what Defendants requested.  *See* Beckworth Decl., Exh. F.  No person listed in OTRS' Amended Initial Disclosure is referred to as a "confidential source" in the Complaint.  Because OTRS does not, at this early stage of discovery, intend to use any of these persons to support its claims at trial, Defendant does not have any need—much less a *substantial need*—to expose the identities of any persons who may have been referred to as a "confidential source" in the Complaint.  *In re St. Paul*, 2007 WL 1424673, at *1.

Moreover, even if OTRS had not amended its Initial Disclosures, Defendants already had the information they seek.  OTRS already provided Defendants with the names of any persons OTRS believes to possess knowledge of relevant facts—including those persons who also are referred to as "confidential sources."  In Interrogatory Number 1, Defendants asked OTRS to identify each person OTRS believes has personal knowledge regarding the facts at issue and to state the facts and or information within

each such person's knowledge.  OTRS responded by objecting to this request on several grounds, including the attorney-client privilege and that the request required OTRS to speculate as to what other people may "know."  Defendants never sought to obtain a ruling on any of these objections.

Nevertheless, OTRS responded by identifying over 100 persons.  *See* Defs.' Motion at Puls Aff, Ex. B (Dkt 122-2).  This list is lengthy because OTRS engaged in an extensive investigation in this case that resulted in a 364 page Complaint—upheld by the Court—and engaged in a diligent effort to ensure that all the potential fact witnesses known to OTRS were listed in response to Interrogatory Number 1.  OTRS did not, as Defendants pejoratively suggest, make this list lengthy because in an effort to "bury" the identity of the persons referred to as "confidential sources."

OTRS ensured that every person referred to as a "confidential source" in the Complaint was included on this list.  *Id*.  OTRS provided the person's name and last known position, as well as a general description of the matters of which OTRS believes they have knowledge.  Accordingly, to the extent a person referred to as a "confidential source" in the Complaint is a person believed to have relevant knowledge, each such person is included on this list.  Defendants have no "need" for this information because they already have the requested information.  *Id*.

Similarly, Defendants have no need to know the information OTRS attributes to each person referred to as a "confidential source" because OTRS provided that information as well.  In Interrogatory Number 4, Defendants asked OTRS to identify the facts provided to OTRS by each person referred to in the Complaint as a "confidential

source." *See* Defds' Motion at Puls Aff, Ex. B (Dkt 122-2). OTRS responded by objecting to Interrogatory Number 4 on several grounds, including attorney client privilege, public policy, and that the request required OTRS to respond on behalf of persons not acting on OTRS behalf. *Id*. Defendants do not seek to obtain a ruling on any of these objections. Subject to these objections, OTRS nonetheless provided <u>an eleven page, single-spaced, summary</u> of the information attributable to the persons referred to as a "confidential sources" in the Complaint. *Id*.. Accordingly, Defendants have no "need" to know what information OTRS believes is known by each person referred to as a "confidential source" because Defendants already have the requested information. *Id*.

The only information Defendants requested, but did not get, was for OTRS to label and expose the persons identified as having knowledge of relevant facts as also being referred to as "confidential sources." *Id*.

Thus, the question before the Court is not whether Defendants need to know the identities of persons with knowledge of relevant facts. They have that. Nor is the question whether Defendants need to know what those persons know. They have that too. The question is whether Defendants have a *substantial need* to expose these persons as "confidential sources." There are reasons why Defendants might *want* such information—to harass and embarrass these witnesses, to put a chilling effect on employees who might be asked to serve as confidential sources in future cases, and to discern OTRS' and Lead Counsel's mental impressions and strategy. But, none of these reasons are legitimate; all of them are against public policy, *Novak v. Kasaks*, 216 F.3d

300, 314 (2d Cir. 2000); and none of them establish that Defendants have a *substantial need* to expose these persons as confidential sources.

### 2. *Defendants Have Not Shown That They Will Suffer Undue Hardship If OTRS Does Not Expose The Identity Of The Persons Referred To As Confidential Sources*

Because Defendants fail the "substantial need" prong of the test, the Court's inquiry can and should end here. Nevertheless, in an abundance of caution, OTRS also will address the second prong of Rule 26(b)(3)'s test, "undue hardship." Just like the "substantial need" test, Defendants cannot show that they will suffer undue hardship if OTRS does not expose the identities of the confidential sources.

The only argument Defendants advance on this issue is the claim, in one sentence, that "MoneyGram *may* be forced to interview and depose dozens of current and former employees to determine who they [the confidential sources] are." Defds' Motion at 10 (emphasis added). This argument is absurd. Defendants are under investigation by the SEC and one or more individual Defendants are named in three suits revolving around the same core facts: Defendants' valuation of their investment portfolio and how they accounted for it. It is inconceivable to think that Defendants have not already done an investigation and interviewed current and former employees who may have been involved in the matters at issues.

It is even more inconceivable that Defendants would not have interviewed the current and former employees in their Investment Department and Systems Accounting Department, given that many of the facts at issue occurred within those departments and

four (4) of the six (6) "confidential sources" referenced in the Complaint worked in one of those departments.

Thus, interviewing and questioning the employees in these departments is not an undue hardship but, rather, something Defendants should already have done in the ordinary course of defending themselves in these three cases and against the SEC.

Equally baseless is Defendants' claim that they will suffer undue hardship because they must parse a list of more than 100 possible fact witnesses, and depose most of those persons, in order to determine whom OTRS referred to as a "confidential source." As discussed above, even a cursory review of the Complaint and OTRS' Response to Interrogatory Number 1 reveals that the universe of possible fact witnesses who also may be referred to as "confidential sources" is *de minimus*.

OTRS already significantly narrowed the field of persons who could possibly be referred to as "confidential sources." To require Defendants to do a little leg work and actually talk to this small group of people is not an "undue hardship." Moreover, if Defendants actually took the time to review the information provided by OTRS more carefully, to examine when each employee worked at MoneyGram, who acted as their Direct Report or Supervisor, and who they worked with, even less effort would be required.

There clearly is no undue hardship preventing Defendants from conducting their own interviews of knowledgeable persons (which would include the persons referred to as "confidential sources." Defendants are in the best position to know what type of information its current and former employees possess. Moreover, the employer-

former/current employee relationship between Defendants and the potential witnesses renders such an investigation "not cost prohibitive."  Indeed, if it was not an undue hardship for OTRS to locate and talk to these people, it is not an undue hardship for MoneyGram to do the same thing.

As such, Defendants have "not shown that there is either a substantial need for the particular information sought, beyond reducing [its] investigative costs by riding on Plaintiffs' coattails, or that they will face an undue hardship without Plaintiffs' identification" of their confidential sources. *MTI*, 2002 U.S. Dist. LEXIS 13015, at *13.

## B.   Defendants' Authority Is Not Controlling, Is Distinguishable and Is Unpersuasive

Defendants know their Motion is deficient under this District's controlling precedent in *In re St. Paul*.  Blinded by their desire to expose these sources, Defendants avoid that case and, instead, primarily rely on two other cases, *In re Connetics Corporation Securities Litigation* and *In re Select Comfort Corporation Securities Litigation*.  These cases are completely distinguishable.

As a threshold matter, OTRS and Lead Counsel have not acted abnormally by relying upon persons labeled as "confidential sources" or by objecting to discovery requests on the basis that names of the persons referred to as "confidential sources" is protected from disclosure by the work product privilege and public policy.  Such practice and objections are the norm in securities fraud litigation.  Moreover, OTRS believes the court's decision in *Connetics* was wrongly decided on the law and wrongly decided based on public policy.  Moreover, in this District *St. Paul*, not *Connetics*, is controlling.  And,

30

most importantly, *Connetics* was decided upon, and limited to, unique facts that are completely distinguishable from facts at issue here.

In *Connetics*, the court addressed whether the identities of confidential sources constituted work product and, if they were not, whether public policy concerns nevertheless precluded their disclosure. 2009 WL 1126508, at *2. The court ultimately ruled that the identities of the sources at issue had to be disclosed under the facts of that case. *Id.* Significantly, in reaching that decision, the court expressly relied upon four factors not present here. *Id.*

First, the court found the issue of whether the identities of confidential sources are protected work product was not decided in the Ninth Circuit or even his District. *Id.* The court cited cases, including *In re Ashworth, Inc. Sec. Litig.*, 213 F.R.D. 385, 389 (S.D. Cal. 2002), holding that such information is privileged. The court ultimately determined the issue is not a black letter one and instead depends on the specific facts at hand. *See id.* (citing *In re Harmonic, Inc., Sec. Litig.*, 245 F.R.D. 424 (N.D. Cal. 2009) (ordering disclosure of sources rather than requiring defendant to take 77 deposition to obtain the information)).

Therefore, as a threshold matter, this case is distinguishable from *Connetics* for the simple reason that, in the District of Minnesota, this issue has already been decided.

Second, the *Connetics* court ruled (albeit incorrectly) that under the facts before it, the defendants would have to take 88 depositions in order to discover information from the 12 confidential witnesses at issue and that such would be inefficient. 2009 WL 1126508, at *1. The court also reasoned that OTRS had not articulated why disclosing

the names of these persons might prejudice its trial strategy. *Id.* at *2.

As such, this case is factually distinguishable from *Connetics* because: (a) as demonstrated above Defendants are not required to conduct anywhere near 88 depositions; and (b) OTRS has explained why revealing this information would affect its trial strategy.  Indeed, as discussed at length above, if Defendant's would simply review the documents already provided to them they could—in no less than a couple of hours—reduce the list of person having relevant knowledge as also being referred to as "confidential sources" to no more than 27 persons.  *See* Section III, *supra*.  Further, if OTRS were forced to expose its sources, Defendants would not only be able to invade Lead Counsel's mental impressions and strategy regarding those persons, but would also be able to thwart OTRS' and Lead Counsel's trial preparation on a go-forward basis because potential fact witnesses would likely be afraid that they too would be exposed and potentially harassed for talking to Lead Counsel.

Third, the *Connetics* court ruled that, while public policy concerns may normally preclude exposing the identities of confidential sources, those concerns were mitigated "by the fact that Connetics Corporation ceased to exist three years ago."  *Id*. at 3 (citing MTI, 2002 WL 32344347 at *5 for the rule of law that public policy concerns normally preclude exposing the identities of confidential sources).[7]  Therefore, the risk that the defendants would use the information to harass, intimidate and/or black ball former employees was not existent.

---

[7]Similarly, in *Ventro*, the precedent relied upon by Judge Ilston, the court found that there were no public policy concerns for protecting the sources because the company no longer existed.  *Ventro*, , 2004 WL 868202 at *2.

Therefore, *Connetics* is distinguishable because MoneyGram, unlike the Connetics, is still in business. *Id.*; *see also MTI,* 2002 U.S. Dist. LEXIS 13015 at *19 (reasoning "there is a legitimate policy concern that militates *against* requiring disclosure [of confidential informants]) (emphasis added); *Fla. State. Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 667-68 (8th Cir. 2001) (reasoning "that there is no need for the name of the [confidential witness] to be pleaded in the complaint."). It is early in this litigation process. MoneyGram is still in business and some of the individual Defendants remain employed by MoneyGram. Thus, there is a real possibility that the disclosure of the individuals as sources may result in the attempt to harass, intimidate or embarrass them, thereby placing a chilling effect on this and other litigation and upsetting the equitable administration of justice. Therefore, in light of these concerns, the witnesses should be protected for doing the right thing.

Fourth, in *Connetics*, counsel argued that it was under no obligation to rely on the statements made by the witnesses to prove its case at trial. 2009 WL 1126508, at *2. The court did not consider counsel's argument as a statement that they did not *intend* to rely upon such witnesses at trial. As such, the court recognized that a plaintiff may not need to disclose their confidential witnesses if they stipulate to not using or relying on them at trial. *Id.* at *2. As discussed above, OTRS has amended its Initial Disclosures. The list of persons identified as likely to have discoverable information has been shortened to include only those persons OTRS intends to use to support its claim. No person included on that list is also referred to as a "confidential source" in the Complaint. Therefore, the present case is easily distinguishable from *Connetics* on this issue as well.

33

Finally, the remaining "great weight" of Defendants' authority likewise is distinguishable and unpersuasive. First, Defendants fail to cite, acknowledge or discuss any contrary authority. *See* Defs.' Motion at 9, n.3. Accordingly, Defendants' "great weight" assertion is simply the biased statement of Defendants' counsel, and not a fact. Second, none of this authority is from this District. *Id.*

Third, and perhaps most importantly, a number of Defendants' cases actually hold that the identity of confidential sources is protected for disclosure based on the work product privilege. *Weiss v. Nat'l Westminster Bank*, 242 F.R.D. 33 (E.D.N.Y. 2007);[8] *Plumbers & Pipefitters Local v. Cisco Sys., Inc.*, 2005 WL 1459555 (N.D. Cal. 2005);[9] *In re Priceline.com Inc. Sec. Litig.*, 2005 WL 1366450 (D. Conn. 2005).[10]

Fourth, *In re Harmonic*, just like Defendants' other California authority *Connetics*, acknowledges that there is no binding precedent on the issue in the California district courts. 245 F.R.D. 424, 427 (N.D. Cal. 2007).

Fifth, regarding Defendants' substantial need and undue hardship argument, each of those cases is readily distinguishable because the universe of potential confidential

---

[8]"[T]he court distinguished between interrogatories seeking discoverable facts and those seeking attorney work product, finding a 'distinction between asking the identity of persons with knowledge, which is clearly permissible, and asking the identity of persons contacted and/or interviewed during an investigation, which is not." *Weiss*, 242 F.R.D. at 61 (citation omitted).

[9] "The Court is persuaded by the rationale underlying this distinction; that is, 'if the identity of interviewed witnesses is disclosed, the opposing counsel can infer which witnesses counsel considers important, revealing mental impressions and trial strategy.'" *Plumbers & Pipefitters Local*, 2005 WL 1459555, at *4 (citation omitted).

[10]"The court holds that the identity of witnesses with whom plaintiffs or their counsel have had contact and individuals referenced in the complaint is attorney work product but that this information is not immune from discovery." *In re Priceline.com*, 2005 WL 1366450, at *4.

sources was significantly larger than it is here and/or the case was very close to trial. *American Floral Serv., Inc. v. Florists' TransWorld Delivery Assoc.*, 107 F.R.D. 258 (N.D. Ill. 1985) (confidential sources were never listed as persons with knowledge, list of persons was between 200 and 2,000); *In re Aetna Inc. Sec. Litig.*, 1999 WL 354527 (E.D. Pa. May 26, 1999) (universe of potential confidential sources was 750); *Plumbers & Pipefitters Local*, 2005 WL 1459555 (the universe of potential confidential sources was at least 496 individuals and the case was near the close of discovery); *In re Marsh & McClennan Co., Inc., Sec. Litig.*, 2008 WL 2941215 (S.D.N.Y. July 30, 2008) (the universe of potential confidential sources was 362 individuals and plaintiff has not disclosed all confidential sources as persons with knowledge of relevant facts; *Miller v. Ventro Corp.*, 2004 WL 868202 (N.D. Cal. April 21, 2004) (the universe of potential confidential sources was 165 after defendants ruled out 35 others and the fact discovery cut-off date was fast approaching).

Sixth, Defendants also improperly rely heavily on *In re Select Comfort Corp. Sec. Litig.*, No. 99-884, Slip Op. (Nov 13, 2001), to allege that case law in the District of Minnesota supports (which it does not) disclosure of confidential witnesses. As a threshold matter, as discussed above *Select Comfort* is not binding precedent in this District. *Select Comfort* is a 2001 case that is unpublished and was decided 6 years before *In re St. Paul*.

Moreover, *Select Comfort* is factually distinguishable. In *In re Select Comfort*, the plaintiff allegedly engaged in dilatory tactics designed to hide the names of persons with basic relevant knowledge. The court took issue with the plaintiffs' vague response

to interrogatories and initial disclosures, in which the plaintiff provided nothing more than the names of 21 individuals. *Select Comfort* at 2-3. After a meet and confer conference, the plaintiffs agreed to provide more information. The plaintiffs then added 93 names to the list, again without providing any addresses, information regarding what they may know, or anything else. *Id*. The parties then had yet another meet and confer, after which the plaintiff agreed to provide more information. Subsequently, the plaintiffs provided the defendants with a set of addresses printed off the internet, and nothing else. Accordingly, the plaintiffs gave defendants nothing more than a list of 100 possible fact witnesses.

The court ultimately ordered the plaintiffs to provide the names, addresses, employer, and telephone number of each witness, to state the names of the persons known to plaintiffs to have personal knowledge, and to state those fact separately. *Id*. at 1-2. The court noted that this information was required by Rule 26; however, the court also noted that the defendants' initial interrogatories did not request the names of witnesses interviewed by plaintiff's counsel. *Id*. at 6.

In subsequent interrogatories, the defendants asked the plaintiffs to state the factual basis for their claims. *Id*. at 7. The plaintiffs responded by referring to a large set of documents. The plaintiffs supplemented their response by referring to a single paragraph in their complaint and stating that the facts therein were based upon interviews with a former company employee. *Id*. The defendants responded by sending additional interrogatories asking the plaintiffs to identify the former employee and provide any documents received from him or her. *Id*. at 8. The court ultimately held that plaintiffs

36

were required to answer the interrogatory by providing the name of the former employee. However, the court noted that the defendants' interrogatories simply used the plaintiffs' own response to a prior interrogatory when asking the name of the person interviewed by counsel. *Id*.

The facts here are completely distinguishable. As a threshold matter, unlike the plaintiffs in *Select Comfort*, OTRS has provided significant information regarding persons with relevant knowledge, the facts they may know, and substantial detail about and attributable to any persons who are also referred to as "confidential sources." Therefore, unlike the defendants in that case, here the Defendants cannot make any credible argument that they have a need for more information or may suffer undue hardship if they do not obtain it. Moreover, *Select Comfort* is devoid of any discussion regarding "confidential sources" or public policy concerns regarding exposing such sources. Such issues simply were not before the court.

In sum, Defendants' "great weight" of authority is nothing of the sort. Rather, Defendants compiled a hodgepodge of cases reaching the conclusion Defendants sought and declared the assortment the "great weight" of authority. Significantly, it appears that Defendants did so without the slightest regard for the actual facts of those cases.

C.     **Public Policy Considerations Weigh In Favor of Protecting The Names of Plaintiffs' Confidential Witnesses from Being Identified.**

Even if Defendants established their undue hardship or substantial need, which Defendants did not do here, public policy considerations weigh strongly in favor of protecting confidential witnesses. As discussed above, compelling the disclosure of

confidential witnesses would have a chilling effect on the critical role that whistleblowers played in exposing this corporate fraud.  *See* Novak *v. Kasaks*, 216 F.3d 300, 314 (2nd Cir. 2000) (stating that by "[i]imposing a general requirement of disclosure of confidential sources serves no legitimate pleading purpose while it could deter informants from providing critical information to investigators in meritorious cases or invite retaliation against them.").

Moreover, strong support is found within Eighth Circuit precedent, among many others, and within Congressional intent for the important role confidential witnesses play in securities litigation.  For example, the Eighth Circuit underscored the importance of protecting confidential informants in *Fla. State. Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 667-68 (8th Cir. 2001), reasoning "that there is no need for the name of the [confidential witness] to be pleaded in the complaint."[11]  Other circuits have reinforced the need to protect confidential informants as well.  *See Novack v. Kasaks*, 216 F.3d 300, 314 (2nd Cir.); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.,* 437 F.3d 588, 596 (7th Cir. 2006).  Congress also echoed the same concern and support for protecting confidential witnesses with the enactment of the Sarbanes-Oxley Act of 2002, PUB. L. NO. 107-204. This Act, among other things, took great efforts to incorporate a variety of measures to ensure that whistleblowers would be protected.  *See* Act at Sections 301, 1107, and 806(a).

---

[11] This is especially true where, as here, OTRS does not intend to rely on these persons in support of their claims at this time.  Accordingly, confidential witnesses should not be disclosed.

Therefore, the courts and Congress have expressed consistent support for the public policy interest of protecting confidential informants that tell the truth and help expose corporate misconduct.  Therefore, the names of the confidential sources should *not* be revealed to MoneyGram because of the realistic possibility of retaliation, harassment, and threats.  Indeed, this very thing has happened before, as noted in the front-page story of THE WALL STREET JOURNAL, and it could very well happen again in this case.[12]

## VI.
## CONCLUSION

Based on the foregoing, Lead Plaintiff OTRS respectfully requests that the Court deny Defendants' Motion to Compel Supplemental Initial Disclosures and Discovery Responses in its entirety.

Dated:  September 29, 2009           **NIX, PATTERSON & ROACH, L.L.P.**
Bradley E. Beckworth
Jeffrey J. Angelovich
Susan Whatley
Brad E. Seidel
205 Linda Drive
Daingerfield, Texas 75638
(903) 645-7333
Fax (903) 645-4415

**LEAD COUNSEL**

---

[12]"For Financial Whistle-Blowers, New Shield Is An Imperfect One," THE WALL STREET JOURNAL, at A1 (Oct. 4, 2004).

**CHESTNUT & CAMBRONNE, P.A.**

By /s/  Karl L. Cambronne
    Karl L. Cambronne #14321
    Jeffrey D. Bores, #227699
    Bryan L. Bleichner, #0326689
    3700 Campbell Mithun Tower
    222 South Ninth Street
    Minneapolis, MN 55402
    (612) 339-7300
    Fax (612)336-2940

**COUNSEL**