# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

In re MoneyGram International, Inc.
Securities Litigation

Civ. No. 08-883 (DSD/JJG)

---

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, NY 10153
(212) 310-8000

**OPPENHEIMER WOLFF & DONNELLY LLP**
3300 Plaza VII Building
45 South Seventh Street
Minneapolis, MN  55402
(612) 607-7000

*ATTORNEYS FOR DEFENDANT MONEYGRAM INTERNATIONAL, INC.*

*ATTORNEYS FOR DEFENDANTS MONEYGRAM INTERNATIONAL, INC., MILNE, PARRIN, BENSON, ROCK, FORD, KIERNAN, MONTEMAYOR, AND TEPLIN*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................... 1

FACTUAL BACKGROUND ........................................................................................... 3

    A.    Oklahoma Teachers' Retirement System. ....................................................... 3

    B.    Plaintiff's Investment Portfolio....................................................................... 5

    C.    Shapiro's Contrarian Investment Strategy....................................................... 6

    D.    Shapiro Buys MoneyGram Stock for Plaintiff. .............................................. 8

    E.    Shapiro Discounts the Growing Subprime Related Concerns Highlighted in the Complaint and Buys More MoneyGram Stock......................................... 9

    F.    Shapiro Continues To Purchase MoneyGram Shares Despite MoneyGram's Third Quarter Disclosures of Additional Losses and Challenges in Valuing its Subprime Investments. ................................................................................. 13

    G.    MoneyGram Recapitalizes.......................................................................... 15

    H.    The Complaint............................................................................................. 16

    I.    Plaintiff's "Cross-Examination" of Shapiro. ................................................ 17

ARGUMENT................................................................................................................ 18

I.    PLAINTIFF BEARS A HEAVY BURDEN AND THE COURT MUST UNDERTAKE A RIGOROUS ANALYSIS OF EACH RULE 23 ELEMENT. ..... 18

II.    PLAINTIFF IS SUBJECT TO A UNIQUE AND CRIPPLING DEFENSE RENDERING IT ATYPICAL FROM AND UNABLE TO ADEQUATELY REPRESENT THE PROPOSED CLASS. ............................................................. 20

III.    SHAPIRO'S DEPOSITION TESTIMONY DEMONSTRATES SERIOUS CONCERNS ABOUT THE CREDIBILITY OF LEAD PLAINTIFF..................... 24

CONCLUSION............................................................................................................. 26

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Basic, Inc. v. Levinson,*
  485 U.S. 224 (1988) ............................................................................ 22

*Bello v. Integrated Resources, Inc.,*
  No. 88 CIV. 1214 (CSH), 1993 WL 52087 (S.D.N.Y. April 19, 1990) .................... 22

*Blue Chip Stamps v. Manor Drug Stores,*
  421 U.S. 723 (1975) ............................................................................ 19

*Cohen v. Laiti,*
  98 F.R.D. 581 (E.D.N.Y. 1983) ......................................................... 22, 26

*Coopers & Lybrand v. Livesay,*
  437 U.S. 463 (1978) ............................................................................ 19

*Elizabeth v. Montenez,*
  458 F.3d 779 (8th Cir. 2006)................................................................ 19

*Greenspan v. Brassler,*
  78 F.R.D. 130 (S.D.N.Y. 1978) .......................................................... 22

*Holden v. Burlington Northern, Inc.,*
  Civ. No. 3-81-994, 1984 WL 1045 (D. Minn. June 15, 1984) ..................................... 3

*In re ADC Telecommunications ERISA Litig.,*
  2005 WL 2250782 (D. Minn. Sep. 15, 2005).......................................... 24

*In re Connetics Corporation Sec. Litig.,*
  No. 3:07-cv-02940 (N.D. Cal.) ............................................................ 5

*In re Delphi Sec. Litig.,*
  No. 05-md-1725 (E.D. Mich.)............................................................. 5

*In re GenesisIntermedia, Inc. Sec. Litig.,*
  232 F.R.D. 321 (D. Minn. 2005)................................................... passim

*In re MBIA, Inc. Sec. Litig.,*
  No. 7:08-cv-00264 (S.D.N.Y.)............................................................. 5

*In re Medtronic Inc. Sec. Litig.,*
  No. 08-cv06324 (D. Minn.) ................................................................. 5

*In re Milk Prods. Antitrust Litig.*,
    195 F.3d 430 (8th Cir. 1999)............................................................................. 20, 23

*In re Miva, Inc. Sec. Litig.*,
    No. 2:05-cv-201-Ftm-29DNF, 2008 WL 681755 (M.D. Fla. March 12, 2008).......... 21

*In re Potash Antitrust Litig.*,
    159 F.R.D. 682 (D. Minn. 1995)............................................................................... 20

*In re Royal Dutch/Shell Transport Sec. Litig.*,
    No. 3:04-cv-00374 (D.N.J.) ......................................................................................5

*J.H. Cohn & Co. v. Am. Appraisal Assoc., Inc.*,
    628 F.2d 994 (7th Cir. 1980)..................................................................................... 21

*Jenson v. Eveleth Taconite Co.*,
    824 F. Supp. 847 (D. Minn. 1993) ..............................................................................3

*Kaplan v. Pomerantz*,
    132 F.R.D. 504 (N.D. Ill. 1990)................................................................................ 26

*Kline v. Wolf*,
    702 F.2d 400 (2d Cir. 1983)...................................................................................... 25

*Landry v. Price Waterhouse Chartered Accountants*,
    123 F.R.D. 474 (S.D.N.Y. 1989) .............................................................................. 22

*Lockwood Motors, Inc. v. General Motors Corp.*,
    162 F.R.D. 569 (D. Minn. 1995)............................................................................... 20

*Masri v. Wakefield*,
    106 F.R.D. 322 (D. Colo. 1984)................................................................................ 20

*McAdams v. Mass. Mut. Life Ins. Co.*,
    No. Civ.A. 99-30284-FHF, 2002 WL 1067449 (D. Mass. May 15, 2002)................. 24

*McGuiness v. Parnes*,
    Civ.A. No. 87-2728, 1988 WL 66214 (D.D.C. June 17, 1988)...................... 21, 22, 24

*Mooney v. Allianz Life Ins. Co. of N. Am.*,
    Civ. No. 06-545 ...................................................................................................... 19

*Nelson v. Craig-Hallum, Inc.*,
    659 F. Supp. 480 (D. Minn. 1987) ............................................................................ 21

*TBK Partners v. Chomeau,*
   104 F.R.D. 127 (E.D. Mo. 1985) .............................................................................. 24

*Walker v. World Tire Corporation, Inc.,*
   563 F.2d 918 (8th Cir. 1977)................................................................................. 3, 18

*Yapp v. Union Pacific R.R. Co.,*
   229 F.R.D. 608 (D. Mo. 2005)..................................................................................... 3

**OTHER AUTHORITIES**

Rule 10b-5 of the Federal Rules of Civil Procedure ........................................................ 19

Rule 23 of the Federal Rules of Civil Procedure............................................18, 19, 20, 24

## PRELIMINARY STATEMENT

This is not an ordinary motion for class certification in a securities class action. Indeed, the facts adduced to date through very limited class action discovery are quite remarkable and show why the Plaintiff is particularly ill-suited to lead the class.

Specifically, lead Plaintiff Oklahoma Teachers Retirement System ("OTRS" or "Plaintiff") retained an investment advisor, Shapiro Capital Management ("Shapiro"), which made all the investment decisions to buy or sell MoneyGram stock on Plaintiff's behalf. In turn, Shapiro admittedly employed a "contrarian" investment strategy and purchased MoneyGram shares on Plaintiff's behalf for reasons that are completely at odds with the allegations in the Complaint. For example only:

- The Complaint alleges that the price of MoneyGram's stock was artificially inflated during the alleged class period. But Shapiro's representative testified that ███████████████████████████████████████ ███████████████████████████████████████████

- The Complaint alleges that MoneyGram made material misrepresentations and omissions by failing to disclose, among other things, the true nature and value of the subprime securities held in its investment portfolio ("Portfolio"). But Shapiro's representative testified that ███████ ███████████████████████████████████████████ ███████████████████████████████

- The Complaint invokes the "fraud on the market" presumption in alleging reliance for all class members. But Shapiro's investment strategy directly rebuts that presumption.

- The Complaint alleges that had MoneyGram only disclosed "more" bad news about its subprime investments, the class would have known not to buy MoneyGram stock. But Shapiro significantly increased Plaintiff's investment in MoneyGram after MoneyGram disclosed in detail its subprime holdings and significant losses.

1

Far from being a typical investor qualified to lead the class, Plaintiff (through its investment advisor) went on a veritable buying spree during a period of tremendous market uncertainty <u>after</u> the subprime crisis had emerged.  Plaintiff purchased more than 100,000 shares of MoneyGram in the fourth quarter of 2007 alone, after MoneyGram had disclosed unrealized losses in connection with the Portfolio of $230 million on October 17 and continuing after MoneyGram disclosed unrealized losses of $337.3 million on November 7, 2007.  Plaintiff did so as part of a highly speculative strategy that relied on Shapiro's singular view that the market had overreacted to concerns over subprime investments and that MoneyGram would soon be snatched up in a takeover at a premium price.

It is black-letter law that a class representative must assert claims that are "typical" of the claims belonging to the class and not be subject to credibility attacks.   Here, Shapiro's admittedly iconoclastic approach to investing and lack of reliance on the very public disclosures the Complaint alleges were misleading, demonstrate how atypical Plaintiff is and stands as a unique defense to any claim of securities fraud by Plaintiff against MoneyGram and the individual defendants.

Recognizing that Shapiro's investment strategy and decisions ran completely counter to the Complaint's allegations, Plaintiff's counsel tried to cure the problem during the deposition of Shapiro's designated representative by conducting a transparently self-serving "cross-examination," which did nothing more than cause the witness to attempt to change "his story" to conform to the Complaint.  Within the space of a few hours, a witness who had earlier testified that ███████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████. Under these unique circumstances, with the credibility of this

critical witness in doubt and the adequacy of Plaintiff to lead the putative class called into

question, the Court should deny the motion for class certification, or require Plaintiff to

produce Shapiro's representative at a live hearing, which would be held for the limited

purpose of allowing the Court to assess, first-hand, his credibility and how his testimony

conflicts with the Complaint's allegations.[1]

## FACTUAL BACKGROUND

### A.    Oklahoma Teachers' Retirement System.

Plaintiff was established by the Oklahoma legislature in 1943 to provide public

retirement allowances and other specified benefits for qualified employees of state-

supported educational systems. (Affidavit of Dennis E. Hansen (hereinafter "Hansen

Aff.") Ex. 1 (October 21, 2009 Deposition of David Kinney ("Kinney Dep.") at 31:21–

23).)    Plaintiff is overseen by a thirteen-member board of trustees and employs

---

[1] The case law is clear that the Court may conduct such a hearing in order to determine the adequacy and credibility of the proposed class representative. *See*, *e.g.*, W*alker v. World Tire Corporation, Inc.*, 563 F.2d 918, 921 (8th Cir. 1977) (holding that a court must allow the parties to develop a record on class certification before deciding the issue and that an evidentiary hearing may be appropriate); *Yapp v. Union Pacific R.R. Co.*, 229 F.R.D. 608, 610 (D. Mo. 2005) (holding two-day evidentiary hearing on class certification motion); *Jenson v. Eveleth Taconite Co.*, 824 F. Supp. 847, 856 n.4 (D. Minn. 1993) (holding multi-week evidentiary hearing on class certification); *Holden v. Burlington N., Inc.*, Civ. No. 3-81-994, 1984 WL 1045, at *5 (D. Minn. June 15, 1984) (court holds that it will have an evidentiary hearing before deciding class certification issues).

approximately forty-five individuals as staff.  (Hansen Aff. Ex. 2 (Dep. Ex. 53); Hansen

Aff. Ex. 3 (Dep. Ex. 54).)  As of June 30, 2008, Plaintiff had 147,739 members.  (Hansen

Aff. Ex. 4.)  To fund its obligations to them, Plaintiff receives revenue from four primary

sources: percentage contributions from its members' paychecks, contributions from the

State's school districts, dedicated revenue from the State of Oklahoma, and investment

revenue from its investment holdings.  (Hansen Aff. Ex. 1 (Kinney Dep. at 32:2–5);

Hansen Aff. Ex. 5.)  As of June 30, 2008, Plaintiff's investments and holdings had a total

market value of approximately $8.94 billion.  (Hansen Aff. Ex. 6.)



79:5.) ████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████ (*See*, *e.g.*, *id.* at 23:8–17; 137:3–13;

138:20–139:1.) ███████████████████████████████ Plaintiff has sought lead

plaintiff status in six securities fraud class actions, not including this action.[3]  It has been

named Lead Plaintiff in one of those actions, and co-lead plaintiff in three others. (*Id.* at

62:25–63:2.)

On or about April 30, 2008, following a recommendation by Nix Patterson,

Plaintiff decided to seek lead plaintiff status in this action. (Hansen Aff. Ex. 8 (Dep. Ex.

67).)  Plaintiff then filed a motion for appointment as lead plaintiff on May 27, 2009, in

which it asserted that its claims were "typical of the claims of the putative class." (*See*

Docket Entry No. 15.)  The Motion was granted on July 22, 2008.

**B.   Plaintiff's Investment Portfolio.**

The Gregory W. Group ("Gregory") serves as Plaintiff's investment advisor.

(Hansen Aff. Ex. 1 (Kinney Dep. at 52:1–18).)  Accordingly, Gregory recommends the

general areas of investment on which Plaintiff's portfolio should focus and occasionally

recommends particular investment opportunities. (*Id.*; Hansen Aff. Ex. 8 (Dep. Ex. 67).)

In    addition,   Gregory   has   an   oversight   role   with   respect   to   Plaintiff's

---

[3] Those actions include: *In re Royal Dutch/Shell Transport Securities Litigation*, No.
3:04-cv-00374 (D.N.J.), *In re Delphi Securities Litigation*, No. 05-md-1725 (E.D. Mich.),
*In re American Home Mortgage Securities Litigation*, 07-MD-1898 (E.D.N.Y.), *In re
MBIA, Inc. Securities Litigation*, No. 7:08-cv-00264 (S.D.N.Y.), *In re Connetics
Corporation Securities Litigation*, No. 3:07-cv-02940 (N.D. Cal.), and *In re Medtronic
Inc. Securities Litigation*, No. 08-cv06324 (D. Minn.). (Hansen Aff. Ex. 7 at Ans. to
Interrog. 12; Hansen Aff. Ex. 1 (Kinney Dep. at 62:10–63:2).)

investment managers. (Hansen Aff. Ex. 1 (Kinney Dep. at 58:13–22; Hansen Aff. Ex. 8 (Dep. Ex. 67).) Plaintiff also retains investment advisors to whom it grants complete investment authority to make investment decisions. One of those investment advisors, Shapiro, was retained by Plaintiff for the purpose of purchasing and selling so-called "small cap" stocks on Plaintiff's behalf. (Hansen Aff. Ex. 7 at Ans. to Interrog. 6; Hansen Aff. Ex. 1 (Kinney Dep. at 59:1–11); *see also* Hansen Aff. Ex. 10.)

Shapiro provided Plaintiff with periodic reports, letters and PowerPoint presentations explaining Shapiro's investment strategy as it pertained to Plaintiff's small cap value investments. (*See, e.g.*, Hansen Aff. Exs. 11 (Dep. Ex. 2), 12, 13 (Dep. Ex. 4), 14 (Dep. Ex. 5), 15 (Dep. Ex. 64), 16, 17, 18 (Dep. Ex. 29), 19 (Dep. Ex. 30), 20 (Dep. Ex. 27), 21–27, 28 (Dep. Ex. 33), 29–33.) Plaintiff admits that "one or more members of [Plaintiff's] Board and executive staff" reviewed reports submitted by Shapiro. (Hansen Aff. Ex. 7 at Ans. to Interrog 8.)

(Hansen Aff. Ex. 34 (October 14, 2009 Deposition of Michael McCarthy ("McCarthy Dep.") at 30:15); Hansen Aff. Ex. 10.)

## C.  Shapiro's Contrarian Investment Strategy.

(*See, e.g.*, Hansen Aff. Exs. 34 (McCarthy Dep. at 18:16–19:24), 11 (Dep. Ex. 2), 14 (Dep. Ex. 5), 28 (Dep. Ex. 33), 35 (Dep. Ex. 11), 36 (Dep. Ex. 28).)

6

███████████████████████████ (*See id.*).  As Shapiro explained in a February 15,

2008 email:



(Hansen Aff. Ex. 37.)

Thus, Shapiro's touted investment strategy could not be more different than a
typical investor who relied on the efficiency of the market to accurately price the value of
a stock and to reflect in that price all of a company's public disclosures.   Quite the
contrary,  ████████████████████████████████████████████

██████████████████████████████████████  (Hansen Aff. Ex.

34 (McCarthy Dep. at 11:11 (emphasis added)).)   Put another way, ██████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████  (*Id.* at 21:11–20.)  ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████  (*Id.* at 32:16–33:4.)

**D.**     **Shapiro Buys MoneyGram Stock for Plaintiff.**

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

(Hansen Aff. Ex. 13 (Dep. Ex. 4).)  Shapiro had first purchased shares of MoneyGram on

Plaintiff's behalf on July 28, 2004, and by the beginning of the class period, Plaintiff held

230,100 shares for a total book value of $4.6 million.  (September 4, 2009 Decl. of Karl

Cambronne ("Cambronne Decl.") Ex. D.)   Shapiro believed that MoneyGram's stock

████████████████████████████████████████████████████

████████████████████████████████████    (Hansen Aff. Ex. 34 (McCarthy Dep. at 31:9–

15).)

By June 30, 2007, OTRS held 326,765 shares of MoneyGram stock, at a book

value of $9.6 million.  (Cambronne Decl. Ex. D.)  Sensing an opportunity at the end of

the second quarter of 2007, and despite the alleged emergence of subprime-related

problems in the broader market place according to the Complaint (*see*, *e.g.*, Compl. ¶¶

99–101, 104–08, 113–17, 139–40, 146–53), Shapiro moved to significantly increase

Plaintiff's position in MoneyGram.  From July 19, 2007 to September 5, 2007, Shapiro

purchased approximately $6.8 million in MoneyGram stock on Plaintiff's behalf, taking

Plaintiff's book value position in MoneyGram from $9.6 million as of July 18, 2007 to

more than $18.3 million as of September 5, 2007, an increase of 362,500 shares.

(Cambronne Decl. Ex. D.)  Plaintiff, which had granted Shapiro full discretion over its

investments, never objected to this strategy or any specific investment, ████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████

**E.    Shapiro Discounts the Growing Subprime related concerns highlighted in the Complaint and Buys More MoneyGram Stock.**

On September 11, 2007, during a public presentation available to all investors, MoneyGram provided a detailed public disclosure of the composition of its Portfolio, including its exposure to subprime investments.[4]   (Hansen Aff. Ex. 38 (Dep. Ex. 7); Hansen Aff. Ex. 39).)  The presentation included detailed charts analyzing MoneyGram's investment exposure to "Residential Mortgage Back Securities," "Alt-A Mortgages," "Subprime Mortgages," and "Collateral Debt Obligations" ("CDOs") that had subprime exposure.   (*Id.*)   In particular, the Company publicly disclosed that it held Alt-A securities valued at $646 million, subprime securities valued at $384 million, and CDO's valued at $620 million, which totaled $1.65 billion and represented 29.5% of the total portfolio of $5.6 billion.   (*Id.*)   Shapiro representatives thoroughly reviewed this disclosure and took detailed notes on the Portfolio's composition, including the specific vintages of the securities in the Portfolio.  (*See* Hansen Aff. Ex. 38 (Dep. Ex. 7).)

████████████████████████████████████████████████

███████████████████████████████████████████   (Hansen Aff. Ex.

34 (McCarthy Dep. at 71:1–2).)   But contrary to the Complaint's allegations, these disclosures and concerns only heightened Shapiro's appetite for MoneyGram stock, as

---

[4] The presentation was attached to an 8-K SEC filing of the same date.  (Hansen Aff. Ex. 39.)

Shapiro apparently believed that the market as a whole had overreacted to subprime concerns. ██████████████████████████████████

██████████████████ (*Id.* at 69:9–14.)  In particular, Shapiro believed that MoneyGram's core ████████████████████████████████████

████████████████████████████████████████████████

██████████ (*Id.* at 70:2–4; 15–16.)

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████

██████████████ (Hansen Aff. Ex. 34 (McCarthy Dep. at 70:18–21).)   Thus, on September 18, 2007, Shapiro's chief of market research, Michael McCarthy, wrote an email to a colleague at another money management firm regarding MoneyGram in which he noted:



(Hansen Aff. Ex. 40 (Dep. Ex. 8).)   On September 25, 2007 and September 26, 2007, Shapiro increased Plaintiff's MoneyGram holdings by $833,791.37, for a total purchase of 39,300 shares.  (Cambronne Decl. Ex. D.)

The contrarian buying in the face of ever-worsening market conditions amidst growing concerns over subprime continued.  In an October 11, 2007 letter from Shapiro to Plaintiff,[5] Shapiro noted:



---

[5] Shapiro had also warned Plaintiff of the risks of the subprime market earlier in 2007. (*See* Hansen Aff. Ex. 35 (Dep. Ex. 11) (October 11, 2007 letter from Shapiro noting that in ███████████████████████████████████████████████████████████████; Hansen Aff. Ex. 41 (Dep. Ex. 3) (April 19, 2007 letter from Shapiro to Plaintiff stating that ████████████████ ████████████████████████████████████████████ (emphasis added).)

███████████████████████████████████████████████████████████
███████████████████████████

(Hansen Aff. Ex. 35 (Dep. Ex. 11 (emphasis added)).) ███████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████ (Hansen Aff. Ex. 34 (McCarthy Dep. at

82:22–83:3; 84:16–21).)   Thus, Shapiro discounted concerns surrounding the Portfolio as

irrelevant.   Indeed, by its own admission, Shapiro's view was that the money transfer

business ████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████   (*Id.* at 104:6–11 (emphasis added).)

Additional disclosures by MoneyGram regarding its increasing concerns about the

status of the subprime market and the effect on MoneyGram's investment portfolio did

little to dissuade Shapiro.  On October 17, 2007 MoneyGram reported an increase of net

unrealized investment portfolio losses of $230 million and disclosed that the losses were

the result of "the illiquidity in the market for subprime asset-backed securities and

CDOs'."  (Hansen Aff. Ex. 42.)  As a result of these disclosures, on October 18 and 19,

respectively, Moody's Corporation and Fitch Inc. downgraded the rating on MoneyGram

securities ─ Moody's to the lowest investment grade and Fitch to one level above "junk."

(Compl. ¶¶ 218–19.)  None of this negative news disturbed Shapiro or gave it pause.  In

fact, Shapiro increased Plaintiff's MoneyGram holdings by over $1.1 million on October

18 and 19, 2007, respectively.  (Cambronne Decl. Ex. D.)  Even when faced with

additional warnings, such as an October 30, 2007 International Strategy and Investment

report highlighting the grim outlook for the CDO market, Shapiro stuck to its strategy and on November 1 and 2, 2007 purchased \$646,917.90 in MoneyGram shares on behalf of Plaintiff. (Cambronne Decl. Ex. D; *see also* Hansen Aff. Ex. 43 (Shapiro's October 30, 2007 reaction to analysis regarding CDO ratings drop and related crash).)

**F. Shapiro Continues to Purchase MoneyGram Shares Despite MoneyGram's Third Quarter Disclosures of Additional Losses and Challenges in Valuing Its Subprime Investments.**

On November 7, 2007, in its quarterly report for the third quarter, MoneyGram disclosed that its unrealized losses related to the Portfolio had increased to \$337.3 million. (Hansen Aff. Ex. 44.) The Company also disclosed that market disruption had caused MoneyGram, like other investors in asset-backed securities, to experience great difficulty in obtaining readily-accessible market information so as to determine and account for the fair value of its investments. (Hansen Aff. Ex. 44 at 12.) In fact, MoneyGram stated that "[d]uring 2007, brokers have become increasingly unwilling to provide pricing on certain securities, requiring the Company to internally value more securities. We expect this trend to continue for the foreseeable future." (*Id.* (emphasis added).)

Indeed, the financial institutions which had created and issued the complex subprime securities that were about to cause the greatest financial crisis in United States history since the Great Depression were themselves announcing massive losses. On October 24, 2007, Merrill Lynch recorded the biggest quarterly loss in its history, including write-downs of \$7.9 billion across collateralized debt obligations and subprime mortgages. (Hansen Aff. Ex. 45.) And on November 4, 2007, Citigroup announced an

$8 to $11 billion reduction in revenue related to subprime related exposures. (Hansen Aff. Ex. 46.)

None of this, however, caused Shapiro to reevaluate its belief that MoneyGram's stock was undervalued. After reviewing MoneyGram's 10-Q, Shapiro recognized that the █████████████████████████████████ (Hansen Aff. Ex. 47 (Dep. Ex. 22) (emphasis added)), ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████ Hansen Aff. Ex. 50 (Dep. Ex. 20 (analysis of November 7, 2007 10-Q)); Hansen Aff. Ex. 51 (Dep. Ex. 21 (Wachovia 10-Q analysis)).) Shapiro clung to its investment strategy even after the ratings agencies began downgrading MoneyGram to junk status and "sell" status. (*See* Hansen Aff. Ex. 52 (Dep. Ex. 23); Hansen Aff. Ex. 47 (Dep. Ex. 22); Hansen Aff. Ex. 48.)

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

(Hansen Aff. Ex. 34 (McCarthy Dep. at 146:11–16; 19–25; 147:9–16).) Shapiro then purchased, on Plaintiff's behalf, $203,962.80 in MoneyGram shares on November 21, and another $710,731.20 in MoneyGram shares on December 6, 2009. (Cambronne Dep. Ex. D.)

On December 13, 2007, MoneyGram publicly cautioned that it had not completed its valuation of its investment portfolio as of November 30, 2007 and that MoneyGram's comments regarding its financial results for the full year 2007 are subject to risks, including the risk of additional material changes in the market value of securities and/or permanent impairments of securities in the Portfolio. (Hansen Aff. Ex. 53.) Nevertheless, in a December 14, 2007 memo sent to its clients, ▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇ Shapiro explained:



(Hansen Aff. Ex. 20 (Dep. Ex. 27 (emphasis added)).)

## G.     **MoneyGram Recapitalizes.**

On January 14, 2008, the last day of the alleged class period, MoneyGram announced it had completed the comprehensive valuation of its investment portfolio as of November 30, 2007 and had experienced additional net unrealized losses of $571 million since September 30, 2007. (Hansen Aff. Ex. 54.) MoneyGram also announced that it had engaged in negotiations with an investment group lead by Thomas H. Lee Partners, L.P. concerning a comprehensive recapitalization of the Company. (*Id.*) The purpose of

the proposed transaction was to provide sufficient capital to support realignment of MoneyGram's investment portfolio away from the asset-backed security market and provide sufficient financial flexibility to support the long-term needs of the business following the realignment.  (*Id.*)

Thereafter, Shapiro began selling off Plaintiff's shares in MoneyGram and [6]  In hindsight, Shapiro explained to Plaintiff that its

(Hansen Aff. Ex. 19 (Dep. Ex. 30); *see also* Hansen Aff. Ex. 23

### H.  The Complaint.

On October 3, 2008, Plaintiff filed a Consolidated Class Action Complaint against MoneyGram and the individual defendants.  The Complaint alleges, among other things, that in order for MoneyGram's investors to have

> all necessary material information before they made a decision whether to buy or sell MoneyGram's stock, it was essential that Defendants use transparent, easy to understand disclosures that presented the exact kind, quality, and identity of MoneyGram's investments as well as the known, existing material adverse risks attendant to such investment and asset/liability strategy.  It was also critical that MoneyGram provide clear and transparent disclosures regarding its accounting practices and methodologies, input and results of the valuation of the Company's investment securities.  Unfortunately, MoneyGram did just the opposite. Indeed, throughout the Class Period, MoneyGram concealed critical information about its Investment Portfolio, its accounting practices, and its

---

[6]

overall financial condition to such a degree that its disclosures were so opaque that neither investors nor analysts could discern what really was going on with respect to the Company's investment securities and overall financial condition.

(Compl. ¶ 42.) The Complaint also alleges that MoneyGram's stock price was artificially inflated by Defendants, who allegedly "engaged in a fraudulent scheme to make investors believe that MoneyGram was not exposed" to the asset-backed securities market. (Compl. ¶¶ 50–51.)

These allegations stand in stark contrast to the actions taken by Shapiro on Plaintiff's behalf throughout the alleged class period. Contrary to the Complaint, Shapiro believed throughout the class period that ███████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████

### I. Plaintiff's "Cross-Examination" of Shapiro.

Michael McCarthy, Shapiro's director of research, was deposed by Defendants on October 14, 2009.[7] The testimony elicited by Defendants from Mr. McCarthy was consistent with the facts laid out above.

During Plaintiff's cross-examination, however, Mr. McCarthy did a complete about face. In response to questions from Plaintiff's counsel, he testified ██████████

---

[7] A complete transcript of the deposition and all cited exhibits are attached to the Affidavit of Dennis E. Hansen filed and served herewith.



(Hansen Aff. Ex. 34 (McCarthy Dep. at 129:7–10)),

(*Id.* at 150:11–18.)  He also agreed with Plaintiff's counsel that, in fact,

(*Id.* at 150:19–151:4.)

(*Id.* at 155:12–13.)

## ARGUMENT

## I.  PLAINTIFF BEARS A HEAVY BURDEN AND THE COURT MUST UNDERTAKE A RIGOROUS ANALYSIS OF EACH RULE 23 ELEMENT.

Class certification is not a rubber-stamp affair.  The due process concerns implicated by certifying a class require the Court to engage in a "***rigorous analysis***" of the requirements of Rule 23 of the Federal Rules of Civil Procedure and look beyond the allegations in the Complaint. *In re GenesisIntermedia, Inc. Sec. Litig.*, 232 F.R.D. 321, 328 (D. Minn. 2005); *see also id.* at 334 (holding that the Supreme Court requires courts to look beyond the allegations in the complaint and "find" facts on a class certification motion due to "the important due process concerns of both plaintiffs and defendants inherent in the certification decision") (quoting *Unger v. Amedisys, Inc.*, 401 F.3d 316, 320–21 (5th Cir. 2005) (citing *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982)); *Walker v. World Tire Corp., Inc.*, 563 F.2d 918, 921 (8th Cir. 1977) ("The propriety of

class action status can seldom be determined on the basis of the pleadings alone . . . [t]he District Court must have before it sufficient material to determine the nature of the allegations, and rule on compliance with the Rule's requirements.") (internal quotations and alterations omitted).  Unlike a Rule 12 motion, on a motion for class certification, courts must require plaintiffs to prove the Rule 23 requirements by a preponderance of the evidence.  *See Mooney v. Allianz Life Ins. Co. of N. Am.*, Civ. No. 06-545 (ADM/FLN), 2009 WL 511572, at \*4 (D. Minn. Feb. 26, 2009) (citing *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 202 (2d Cir. 2008); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307 (3d Cir. 2009)).

This "rigorous analysis" is critical at the class certification stage because the grant or denial of class certification has a tremendous, and often outcome-determinative, impact on the litigation.  *See, e.g., Coopers & Lybrand v. Livesay*, 437 U.S. 463, 476 (1978) ("Certification of a large class may so increase the defendant's potential damages liability and litigation costs that he may find it economically prudent to settle and to abandon a meritorious defense."); *Elizabeth v. Montenez*, 458 F.3d 779, 784 (8th Cir. 2006) (acknowledging the likelihood that granting certification may force a defendant to settle rather than incur defense costs and run the risk of potentially ruinous liability); *see also Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 739 (1975) ("litigation under Rule 10b-5 presents a danger of vexatiousness different in degree and in kind from that which accompanies litigation in general").

Despite the rigorous requirements of Rule 23, Plaintiff's moving brief does no more than recite in conclusory terms that a class is appropriate. Plaintiff has not come

19

close to carrying its heavy burden, nor has it even attempted to demonstrate how its unique and "contrarian" investing strategy of speculating on a potential takeover of an at-risk company renders it typical as a class representative.

## II.   PLAINTIFF IS SUBJECT TO A UNIQUE AND CRIPPLING DEFENSE RENDERING IT ATYPICAL FROM AND UNABLE TO ADEQUATELY REPRESENT THE PROPOSED CLASS.

To demonstrate "typicality," Plaintiff must prove that its "claims or defenses . . . are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3); *In re GenesisIntermedia*, 232 F.R.D. at 329. A class representative who is subject to a defense that is not applicable to the class at large is by definition not typical and cannot adequately represent the class. *In re Milk Prods. Antitrust Litig.*, 195 F.3d 430, 437 (8th Cir. 1999) ("A proposed class representative is not adequate or typical if it is subject to a unique defense that threatens to play a major role in the litigation."); *In re GenesisIntermedia*, 232 F.R.D. at 329 ("where the representative parties are subject to unique defenses, their claim is not typical of the class") (quoting *Irvin E. Schermer Trust by Kline v. Sun Equities Corp.*, 116 F.R.D. 332, 336–37 (D. Minn. 1987)). In order to demonstrate adequacy, Plaintiff must prove that Plaintiff's "interests are sufficiently similar to those of the class such that it is unlikely that their goals and viewpoints will diverge." *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 692 (D. Minn. 1995); *see also Lockwood Motors, Inc. v. General Motors Corp.*, 162 F.R.D. 569, 576 (D. Minn. 1995).[8]

---

[8] Courts routinely deny class certification where the class representative, such as Plaintiff, is subject to a unique defense because "[t]here is concern that the representation of the class will suffer as the representative becomes distracted by the presence of possible defenses applicable only to him." *Masri v. Wakefield*, 106 F.R.D. 322, 325 (D. Colo.

In order to find Plaintiff atypical and inadequate, the Court need not determine whether a unique defense against Plaintiff will ultimately succeed on the merits. As recognized by this Court:

> [i]t is not necessary that the defense asserted against the proposed class representative ultimately succeed. Rather, <u>the presence of even an arguable defense peculiar to the proposed representative may destroy typicality of the class</u> . . . .

*In re GenesisIntermedia*, 232 F.R.D. at 329 (quoting *Sun Equities Corp.*, 116 F.R.D. at 336–37) (emphasis added); *see also, e.g.*, *J.H. Cohn & Co. v. Am. Appraisal Assoc., Inc.*, 628 F.2d 994, 999 (7th Cir. 1980) ("the presence of even an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the typicality of the class as well as bring into question the adequacy of the named plaintiff's representation").

Here, based on the limited record developed to date, Plaintiff is completely atypical and subject to unique defenses that disqualify it from serving as a class representative.[9] As discussed above, Plaintiff essentially alleges that MoneyGram's failure to disclose the value and make-up of the Portfolio inflated the company's stock

---

1984). In addition, such unique defenses raise concern that a judgment against the class representative could imperil the rights of the class. *See McGuiness v. Parnes*, Civ.A. No. 87-2728, 1988 WL 66214, at *3 (D.D.C. June 17, 1988) (denying class certification because a unique defense would "embroil [plaintiff] in atypical issues," and because "should [plaintiff] lose on the merits, [it would] imperil the rights of most of the allegedly injured investors").

[9] Because Shapiro made investment decisions on Plaintiff's behalf, the actions of Shapiro in determining whether or not to invest in MoneyGram stock are imputed to Plaintiff. *See, e.g.*, *In re Miva, Inc. Sec. Litig.*, No. 2:05-cv-201-Ftm-29DNF, 2008 WL 681755, at *5 (M.D. Fla. Mar. 12, 2008) (holding that investment analyst's reliance on the market applies to the client/plaintiff investor); *Nelson v. Craig-Hallum, Inc.*, 659 F. Supp. 480, 488 (D. Minn. 1987) (recognizing that an investment broker is a "conduit" of market information to the plaintiff).

price.   But Plaintiff's own investment advisor pursued a strategy which completely ignored the value of the Portfolio and the many warnings and disclosures made by MoneyGram throughout the class period concerning growing subprime-related losses in the portfolio.

Plaintiffs in 10b-5 securities cases bear the burden of proving causation and reliance.   Even in the instance where the oft-cited "efficient market" presumption of reliance exists, where that presumption is rebutted, the claim fails.   *Basic, Inc. v. Levinson*, 485 U.S. 224, 247–48 (1988).   When evidence shows the plaintiff would have invested regardless of knowing the true information, and in particular, where it is shown that the plaintiff did know and invested nonetheless, any presumption of reliance is destroyed and the claim fails on an individual basis. *Id.*; s*ee also, e.g.*, *McGuiness*, 1988 WL 66214, at *2–4 (quoting *Basic*, 485 U.S. at 248); *Kovaleff v. Piano*, 142 F.R.D. 406, 408 (S.D.N.Y. 1992); *Greenspan v. Brassler*, 78 F.R.D. 130, 132 (S.D.N.Y. 1978).

Courts have held that a plaintiff who did not rely on either the integrity of the market or the alleged misleading information disseminated by defendants is not entitled to the presumption of reliance. *See, e.g.*, *Bello v. Integrated Resources, Inc.*, No. 88 CIV. 1214 (CSH), 1990 WL 52087, at *2 (S.D.N.Y. April 19, 1990); *Cohen v. Laiti*, 98 F.R.D. 581, 583–84 (E.D.N.Y. 1983); *Landry v. Price Waterhouse Chartered Accountants*, 123 F.R.D. 474, 476 (S.D.N.Y. 1989); *see also GenesisIntermedia*, 232 F.R.D. at 329–30. The case here gives rise to a particularly devastating and unique defense to Plaintiff's claims because Plaintiff actually traded on the risks known to be associated with MoneyGram's investment portfolio as part of a unique and risky investment strategy—

██████████████████████████████████████████

███████████████████████████████████. Uniquely to Plaintiff, and

contrary to the allegations on behalf on the putative class, Plaintiff, through its

investment manager Shapiro, did not believe ███████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████ (*See, e.g.*, Hansen Aff. Ex. 58; Hansen Aff. Ex. 59

(Dep. Ex. 13); Hansen Aff. Ex. 40 (Dep. Ex. 8); Hansen Aff. Ex. 9 (Dep. Ex. 17); Hansen

Aff. Ex. 35 (Dep. Ex. 11).)

As outlined above, this Court need not determine at this stage of the case whether

these unique defenses will succeed on the merits. These facts more than adequately

demonstrate an arguable defense unique to the proposed class representative that destroys

the required element of typicality as well as brings into question the adequacy of the

named plaintiff's representation. *In re Milk Prods. Antitrust Litig.*, 195 F.3d at 437 ("A

proposed class representative is not adequate or typical if it is subject to a unique defense

that threatens to play a major role in the litigation."); *In re GenesisIntermedia*, 232

F.R.D. at 329 ("where the representative parties are subject to unique defenses, their

claim is not typical of the class.") (quoting *Sun Equities Corp.*, 116 F.R.D. at 336–37).

Plaintiff will have to expend significant time and resources responding to a unique

defense on these issues that is distinct from the putative class. Even if MoneyGram does

not ultimately prevail on this defense, it will "embroil the Court and the parties in a

complex issue on the merits" and risks subordinating the class' interests to Plaintiff's

interests. *McGuiness*, 1988 WL 66214, at \*2–\*3; *see also, e.g., McAdams v. Mass. Mut. Life Ins. Co.*, No. Civ.A. 99-30284-FHF, 2002 WL 1067449, at \*6 (D. Mass. May 15, 2002) (discussing *Beaver Falls Thrift Corp. v. Commercial Credit Bus. Loans, Inc.*, 563 F.Supp. 68, 71–72 (W.D. Pa. 1983) and recognizing that a unique defense that "would require the evaluation of 'numerous' oral and written communications, and the testimony of at least two witnesses" was sufficient to risk "subordination of the interests of the class"). This risk and distraction precludes certification of Plaintiff as a class representative here.

## III. SHAPIRO'S DEPOSITION TESTIMONY DEMONSTRATES SERIOUS CONCERNS ABOUT THE CREDIBILITY OF LEAD PLAINTIFF.

It is well-established that a class representative's honesty and integrity must be considered by the Court when determining the adequacy of a proposed class representative under Rule 23. *See TBK Partners v. Chomeau*, 104 F.R.D. 127, 132 (E.D. Mo. 1985) ("'The credibility of a plaintiff may be considered by the trial judge in determining the plaintiff's adequacy as a class representative.'") (quoting *Panzirer v. Wolf*, 663 F.2d 365, 368 (2d Cir. 1981); *see also In re ADC Telecommunications ERISA Litig.*, 2005 WL 2250782 (D. Minn. Sep. 15, 2005) (holding that plaintiff could not be appointed class representative where defendants raised issues regarding his credibility, as doing so would "subject him to vigorous cross-examination which would be disadvantageous to other class members"). Mr. McCarthy, Shapiro's representative, told two conflicting stories regarding Shapiro's decision to invest in MoneyGram stock on

behalf of Lead Plaintiff.   Under questioning from Defendants, Mr. McCarthy testified
that Shapiro believed that:



But after being questioned by Plaintiff's counsel, Mr. McCarthy changed his tune,
testifying that in fact:



The shifting story put forth by Plaintiff's investment advisor raises real questions about
Plaintiff's credibility and adequacy as class representative.   Plaintiff will no doubt argue
that Mr. McCarthy's testimony is not self-contradicting.   But no matter how Plaintiff
spins it, the fact remains that under questioning from Plaintiff, Mr. McCarthy's testimony
was fundamentally at odds with his written communications during the class period
and his prior answers to Defendants' questions.   Courts have denied class certification
where issues of credibility are raised in connection with deposition testimony of a
proposed class representative.   *See Kline v. Wolf*, 702 F.2d 400, 403 (2d Cir. 1983)
(upholding district court's denial of class certification on grounds that plaintiff's
credibility was in doubt, and stating that "[s]ince plaintiffs' testimony on an issue critical
to one of their two causes of action was subject to sharp attack, the district court

reasonably concluded that their credibility in general was sufficiently in doubt to justify denying them a fiduciary role as class representatives with respect to both claims"); *Kaplan v. Pomerantz*, 132 F.R.D. 504, 510 (N.D. Ill. 1990) (holding that "a plaintiff's honesty and integrity are important considerations in allowing him to represent a class," and decertifying the class where plaintiff's statements in a deposition "reflect a deliberate attempt to conceal information"). "Credibility problems need not be firmly established" in order to deny class certification, "a preliminary finding is sufficient." *Cohen*, 98 F.R.D. at 582 (quoting *Kline*, 702 F.2d at 403). In addition, class certification is inappropriate if plaintiff's "credibility suffers with regard to only one . . . claim[]"— "contradictions between the allegations in the complaint and the testimony of [plaintiff] . . . may not be glossed over." *Id.* Accordingly, because of the credibility issues raised by Mr. McCarthy's testimony, the Court should deny class certification.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiff's motion for class certification.

Dated:  November 20, 2009          **OPPENHEIMER WOLFF & DONNELLY LLP**

By: _s/ Michael J. Bleck_

| | |
|---|---|
| Michael J. Bleck | # 8862 |
| Bret A. Puls | # 305157 |
| Meghan M. Anzelc | #386534 |
| Dennis Hansen | #386734 |
| Mark Schneebeck | #348922 |

3300 Plaza VII Building
45 South Seventh Street
Minneapolis, MN  55402
Telephone:  (612) 607-7000
Facsimile:  (612) 607-7100

*ATTORNEYS FOR DEFENDANTS MONEYGRAM
INTERNATIONAL, INC., MILNE, PARRIN,
BENSON, ROCK, FORD, KIERNAN,
MONTEMAYOR, AND TEPLIN*

**AND**

**WEIL, GOTSHAL & MANGES LLP**
Joseph S. Allerhand (admitted *pro hac vice*)
Paul Ferrillo (admitted *pro hac vice*)
Michael J. Firestone (admitted *pro hac vice*)
767 Fifth Ave.
New York, NY 10153
Tel: (212) 310-8636
Fax: (212) 310-8000

*ATTORNEYS FOR DEFENDANT MONEYGRAM
INTERNATIONAL, INC.*

27